UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 FEB 20  AM II: 00

CLERK

BY _____ *LAW*
DEPUTY CLERK

CARL WEISS, )
)
Plaintiff, )
)
v. )  Case No. 2:24-cv-00591-cr
)
LINCOLN NATIONAL LIFE INSURANCE )
COMPANY and VERISTA, INC., )
)
Defendants. )

## OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
## ADMINISTRATIVE RECORD AND GRANTING DEFENDANTS' MOTIONS
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD
### (Docs. 36, 39, 42)

Plaintiff Carl Weiss ("Plaintiff") filed this action pursuant to 29 U.S.C. §

1132(a)(1)(B) against Defendants Lincoln National Life Insurance Company ("Lincoln")

and Verista, Inc., ("Verista"), (collectively, "Defendants") to recover benefits under two

employee welfare benefit plans, a short-term disability plan (the "STD") and a long-term

disability plan (the "LTD") (collectively, the "Plans"), which are subject to the Employee

Retirement Income Security Act of 1974 ("ERISA"). Pending before the court are cross-

motions for judgment on the administrative record.[1]

Plaintiff is represented by Craig A. Jarvis, Esq. Lincoln is represented by Byrne J.

Decker, Esq. Verista is represented by Shapleigh Smith, Jr., Esq.

---

[1] On June 26, 2025, Plaintiff moved for judgment on the administrative record. (Doc. 36.)
Lincoln opposed the motion on August 27, 2025, and cross-moved for judgment in its favor.
(Docs. 39, 41.) Verista opposed the motion on August 29, 2025, and cross-moved for judgment
in its favor. (Docs. 42, 43.) Plaintiff opposed Lincoln's and Verista's cross-motions for judgment
on the administrative record on September 4, 2025. (Doc. 45.)

## I.    The Court's Findings of Fact.

Based upon the administrative record ("AR") and the preponderance of the evidence, the court makes the following findings of fact.

### A.    The STD.

On and before February 18, 2022, Verista maintained the STD for the benefit of its employees. Lincoln served as the STD claim administrator and provided non-fiduciary claim processing services. The summary plan for the STD states in relevant part:

> The information contained in this document is merely a compilation of the Company's short-term disability Plan provisions for use in administering claims and is not intended to be a Plan document on which a participant may rely for benefits. The Company has reviewed and approved the summary of the Plan's provisions contained herein. The Company is the Plan Fiduciary.
>
> The Plan provides short term disability (STD) benefits to eligible participants under the terms and conditions of the Plan[]. The Plan is a self-funded welfare benefit Plan (Plan). The Plan is administered by Verista, Inc. (Company).
>
> The Lincoln National Life Insurance Company (together with its affiliates and subsidiaries, "Lincoln") (Lincoln) provides non-fiduciary claim processing services to the Plan. The Plan is not insured by Lincoln, and Lincoln has not issued any insurance policy that would fund benefits under the Plan. Lincoln is not responsible to fund the payment of any benefits under the Plan.
>
> This document provides a summarized explanation of the Plan benefits in effect as of the date on the front page of this document. The master Plan[], if any, more fully describes the terms and conditions of the Plan. If the terms of this document and the master Plan differ, the master Plan will govern. A complete copy of the master Plan, if any, is in the possession of the Company and is available for your review upon request. In the event of any changes in benefits or Plan provisions, the Company will provide you a new summary Plan description, a statement of material modification, or a supplement that describes any changes.

(AR 2964.) Although the STD references "the master Plan," there is no master plan in the administrative record.

The STD provides a weekly benefit to qualified employees who become disabled for up to twenty-six weeks. The STD defines "Disability" as when "the Employee, as a

result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job[,]" meaning "responsibilities that are normally required to perform the Employee's Own Job and cannot be reasonably eliminated or modified." (AR 2967-68) (emphasis and internal quotation marks omitted). To qualify for disability benefits under the STD, "the Injury must occur and Disability must begin while the Employee is a participant of this Plan." (AR 2971.) An employee ceases to qualify as a participant of the STD when his or her "date of employment terminates." (AR 2976.)

The STD contains an "Elimination Period[,]" which is "a period of consecutive days of Disability for which no benefit is payable." (AR 2967) (emphasis and internal quotation marks omitted). The elimination period "begins on the first day of Disability[,]" and if a disability results from sickness, "7 calendar days" is the elimination period. (AR 2965, 2967.) "Benefits will begin on the first day following the completion of the Elimination Period." (AR 2965.)

The STD states the following regarding notice of claims:

    a. Notice of claim must be given to the Plan within 30 days of the date of the loss on which the claim is based. If that is not possible, Lincoln, on behalf of the Company, must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to the Plan.

    b. When written notice of claim is applicable and has been received by the Plan[,] the Employee will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Employee can send to the Plan written Proof of claim without waiting for the forms.

(AR 2977.)

Proof of loss must be furnished no later than thirty days after the elimination period ends unless "it was not reasonably possible to furnish such Proof within such time. Such proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required." (AR 2978.) The STD does not contain a discretionary clause granting its fiduciary or administrator authority to interpret the Plan.

3

### B.     The LTD.

On and before February 18, 2022, Verista maintained the LTD for the benefit of
its employees, which was funded by Lincoln. The LTD provides a weekly benefit to
qualified employees who become disabled for up to twenty-four months. Under the LTD,
disability is defined as follows:

i.      [T]hat during the Elimination Period and the next 24 months of
        Disability the Covered Person, as a result of Injury or Sickness, is
        unable to perform the Material and Substantial Duties of his Own
        Occupation; and

ii.     [T]hereafter, the Covered Person is unable to perform, with
        reasonable continuity, the Material and Substantial Duties of Any
        Occupation.

(AR 2898.) "Own Occupation" is "the Covered Person's occupation that he was
performing when his disability . . . began[,]" and "Any Occupation" is "any occupation
that the Covered Person is or becomes reasonably fitted [for] by training, education,
experience, age, [and] physical and mental capacity." (AR 2897, 2902) (emphasis and
internal quotation marks omitted).

The LTD contains a "Pre-Existing Condition Exclusion" stating, "[t]his policy will
not cover any Disability or Partial Disability: (1) which is caused or contributed to by, or
results from, a Pre-Existing Condition; and (2) which begins in the first 12 months
immediately after the Covered Person's effective date of coverage." (AR 2925)
(emphasis omitted). A "Pre-Existing Condition" is defined as "a condition resulting from
an Injury or Sickness for which the Covered Person is diagnosed or received Treatment
within three months prior to the Covered Person's effective date of coverage." *Id.*
(emphasis and internal quotation marks omitted). Treatment includes "receiving care or
services provided by or under the direction of a Physician including diagnostic measures,
being prescribed drugs and/or medicines, whether the Covered Person chooses to take
them or not, and taking drugs and/or medicines." (AR 2905.)

The LTD defines a "Covered Person" who is eligible to receive benefits as "an
Employee insured under this policy." (AR 2897) (emphasis and internal quotation marks
omitted). "A Covered Person will cease to be insured" under the LTD on "the last day of

the month coincident with or next following the date employment terminates." (AR 2926.)

The LTD contains its own "Elimination Period[,]" which is "a period of consecutive days of Disability or Partial Disability for which no benefit is payable." (AR 2899) (emphasis and internal quotation marks omitted). The LTD's Elimination Period begins on the first day of disability and continues until "[t]he greater of: [(a)] the end of the Covered Person's [STD] Benefits; or [(b)] 180 days." (AR 2894.)

The LTD provides the following regarding notice of claims:

   a. Notice of claim must be given to Lincoln within 30 days of the date of the loss on which the claim is based. If that is not possible, Lincoln must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to Lincoln.

   b. When written notice of claim is applicable and has been received by Lincoln, the Covered Person will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Covered Person can send to Lincoln written Proof of claim without waiting for the forms.

(AR 2930.)

Proof of loss under the LTD must be "given to Lincoln no later than 90 days after the end of the Elimination Period[,]" but "[f]ailure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time." *Id.* Proof of loss "must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required." *Id.* The LTD provides:

   "Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

   1. [A] claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

   2. [A]n attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

5

> 3. [T]he provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Lincoln.

(AR 2904) (emphasis omitted).

The LTD states that it is governed by the laws of Indiana: "Governing Jurisdiction is Indiana and subject to the laws of that State." (AR 2891) (emphasis omitted). It also contains the following discretionary clause: "Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (AR 2929.)

## C.    Plaintiff's Pre-Employment Medical Care.

On April 22, 2021, Plaintiff went to the emergency department ("ED") at Southwestern Vermont Medical Center ("SVMC"), reporting that he was having "pre[-]seizures" for several days. (AR 708.) He told the ED doctor that he had two seizures previously and reported "tingling and numbness to the side of his face, his lips, his hands, and his feet" over the course of a week. *Id.* The ED doctor found that Plaintiff's "head CT and labs are all completely normal" and concluded "[h]is symptoms . . . may be related to some hyperventilation or anxiety." (AR 771.)

Thereafter, from May 9, 2021, to November 17, 2021, Plaintiff attended eight medical visits and follow-ups with his regular healthcare provider, Dr. Peter Park. During these visits, Plaintiff received treatment for anxiety, depression/hysteria, attention deficit disorder ("ADD"), anemia, elevated liver enzymes, memory loss, marijuana use, and back pain.

On May 9, 2021, Plaintiff visited Dr. Park for "abdominal discomfort[,]" and Dr. Park noted that Plaintiff's "[a]bdomen [was] still distended," with pain "vacillat[ing]." (AR 2685.) Dr. Park found that Plaintiff had "[m]ild nausea[] [and] no vomiting[]" and that Plaintiff's "[o]verall functionality [and] mental status seem[] to be improving." *Id.* In his examination, Dr. Park found that Plaintiff was "well developed, well nourished, [and] in no acute distress[]" and that Plaintiff's abdomen was "non[-]tender[ and had] no

6

organomegaly." (AR 2688.) Dr. Park noted that Plaintiff's anemia, elevation of liver transaminase levels, and "anxiety depression/hysteria or both" were improved. (AR 2689) (capitalization removed).

In his notes, Dr. Park indicated that Plaintiff's "Marijuana Use-daily, Oil, Combustible" was a prior and current issue. (AR 2685.) At the time of the visit, in addition to his marijuana use, Plaintiff was taking three medications daily: two 20-milligram tablets of citalopram, one 1-milligram tablet of guanfacine, and one 2-milligram tablet of aripiprazole ("Abilify").

The following day, on May 10, 2021, Plaintiff received the Janssen COVID-19 ("COVID") vaccine, also known as the Johnson & Johnson COVID vaccine. Later that month, on May 29, 2021, Plaintiff visited Dr. Park "for [a] follow-up of mood[ and] medication[,]" during which they discussed Plaintiff's marijuana use "to focus" and Plaintiff "feeling poor memory." (AR 2691.) Dr. Park noted that Plaintiff "[c]omplains of difficulty with concentration[]" and anxiety but "denies poor balance, headaches, disturbances in coordination, numbness, inability to speak, falling down, tingling, brief paralysis, visual disturbances, seizures, weakness, sensation of room spinning, tremors, fainting, excessive daytime sleeping, and memory loss." (AR 2693.) In his recommendations, Dr. Park found that Plaintiff's anxiety, depression/hysteria, ADD, and marijuana use were improved and that Plaintiff's memory loss was unchanged but his "focus improved[.]" (AR 2696.)

A few weeks later, on June 17, 2021, Plaintiff followed up with Dr. Park "to review mood and medication[,]" during which Plaintiff reported that he was "[c]oncerned about ADD symptoms[,]" "[h]aving difficulty with focus and concentration[,]" and "wanting to restart . . . [A]dderall[.]" (AR 2697.) Plaintiff reported using marijuana "multiple times per day." (AR 2699.) Dr. Park found Plaintiff was "well developed, well nourished, in no acute distress[,]" and "alert,[]oriented, and cooperative[]" with a "normal mood and affect[]" and "normal attention span and concentration." (AR 2700.) Dr. Park concluded that Plaintiff's anxiety and depression/hysteria had improved but Plaintiff was "[h]aving difficulties with focus and concentration and getting things

7

done[.]" *Id.* At Plaintiff's request, Dr. Park prescribed Plaintiff a daily dose of 5 milligrams of dextroamphetamine-amphetamine ("Adderall") to assist Plaintiff's concentration.

Nearly two weeks later, on June 30, 2021, Plaintiff visited Dr. Park "for [a] follow-up of mood and medication[,]" during which Plaintiff reported that he was doing "[a]s much as he can to reduce all barriers to improved memory and focus." (AR 2702.) Dr. Park found that Plaintiff's anxiety, depression/hysteria, and marijuana use had improved while Plaintiff's ADD remained unchanged. Dr. Park increased Plaintiff's Adderall dosage from 5 milligrams to 10 milligrams daily.

The following month, on July 24, 2021, Plaintiff visited Dr. Park for follow-up and reported that his ADD and anxiety were "still scatter[]ed [with] some improvement on the current dose." (AR 2707.) In his examination, Dr. Park found that Plaintiff was "alert,[]oriented, and cooperative[]" with a "normal mood and affect[]" and "normal attention span and concentration." (AR 2710.) Dr. Park concluded that Plaintiff's ADD was improved and prescribed a "slightly increased dose, from 10 m[illi]g[rams] to 15 m[illi]g[rams.]" *Id.* Dr. Park found that Plaintiff's anxiety, depression/hysteria and "chronic, intermittent" back pain were also improved. (AR 2707) (capitalization removed).

Almost one month later, on August 25, 2021, Plaintiff followed up with Dr. Park, reporting that he was engaging in "more reg[ular] exercise," "[g]etting better," and "[f]eeling stronger and fitter." (AR 2683.) Plaintiff noted that he would be starting a "new job" the following week and it was a "[g]ood gig." *Id.* He apparently expressed no concerns about his ability to perform the essential functions of his new job. Plaintiff advised that his 15-milligram dose of Adderall was "closer [but] not there." *Id.* In his examination, Dr. Park found Plaintiff to be "healthy[]appearing, well[]nourished, and well[]developed." (AR 2684.) Plaintiff was "oriented to time, place, and person[]" with "normal mood and affect" and had normal "recent memory" and normal "remote memory[.]" *Id.* Dr. Park concluded that Plaintiff's ADD, anxiety, and depression/hysteria

8

were improved and prescribed Plaintiff an increased, 20-milligram daily dose of Adderall.

### D.   Plaintiff's Employment at Verista.

Plaintiff was hired by Verista on August 30, 2021.[2] He held an engineering position at Verista, and his role involved "[r]emote work at home" using a computer. (AR 2856.)

### E.   Plaintiff's Medical Care While Employed at Verista.

Nearly a month after starting at Verista, on September 22, 2021, Plaintiff visited Dr. Park for a follow-up, wherein Plaintiff reported that he had "no depression or anxiety[]" and that his "[c]urrent regimen is an improvement and is tolerated. Feels functional. No problems and side effects. Work is going well." (AR 2679.) Dr. Park concluded that Plaintiff's ADD was improved and that Plaintiff was "[f]unctioning at a high level" and "[d]oing well with [his] new job[.]" (AR 2680.)

Thereafter, during Plaintiff's annual examination with Dr. Park on November 16, 2021, Dr. Park advised Plaintiff to obtain a COVID vaccine booster, although Dr. Park noted that because of Plaintiff's age and "general health," Plaintiff was "not at super high risk." (AR 2673.) Dr. Park found Plaintiff was "healthy[]appearing[]" and "ambulat[ing] without assistance[]" and had "no depression" and "no fatigue." *Id.* Plaintiff confirmed that he had recently experienced "no loss of consciousness, no weakness, no numbness, no seizures, no dizziness, and no headaches." *Id.*

Dr. Park's physical examination of Plaintiff on November 16, 2021, yielded normal results. Dr. Park found that Plaintiff's vision was "grossly intact" and Plaintiff's remote and recent memory were "normal." (AR 2673-74.) Dr. Park noted that Plaintiff had not received a recent eye examination and Plaintiff complained of some hearing issues, and as a result, Dr. Park referred Plaintiff to an optometrist and audiologist. The

---

[2] The parties dispute whether Plaintiff's wages were computed on a salary or hourly basis or whether Plaintiff's position was as a software engineer or consultant. The administrative record does not clarify these issues. However, these disputes are immaterial for purposes of determining whether Plaintiff is entitled to benefits under the STD and LTD.

following day, on November 17, 2021, Plaintiff visited Dr. Park and received a COVID vaccine. He did not report having COVID-like symptoms during this time period and reported no COVID-like symptoms to a medical provider in December 2021 or January 2022.

On February 15, 2022, Plaintiff visited Dr. Park "for [a] follow-up of mood[,] medication[,] etc." (AR 2662.) Dr. Park noted that Plaintiff had "new concern regarding blood in [his] phlegm" because he thought he "had a little speck of blood in [his] phlegm this morning." (AR 2659, 2662.) During this visit, Plaintiff reported that he was "[s]leepy[,]" that he was cutting down his THC intake, and that "[w]ith decreased THC[,] [he] feels 'catatonic' for periods of time." (AR 2662.) Plaintiff advised that his ADD was "fine" and that he had no "[n]eg[ative] systemic symptoms [and] overall feels well." *Id.* Dr. Park noted that Plaintiff complained of "no fever, no night sweats," "no cough, no wheezing, no shortness of breath," "no loss of consciousness, no weakness, no numbness, no seizures, no dizziness, and no headaches." *Id.* He found that Plaintiff was "healthy[]appearing, well[]nourished, and well[]developed[,]" in "no acute distress[,]" and "ambulat[ing] without assistance." *Id.* According to Dr. Park, Plaintiff had "good judg[]ment[,]" "normal mood and affect[,]" "normal" recent and remote memory, and was "active and alert[]" and "oriented to time, place, and person[.]" *Id.*

With respect to Plaintiff's reported fatigue, Dr. Park indicated that Plaintiff should receive blood work and noted, "[f]atigue, with change of cannabis use, THC smoked 2 oils and edibles. [Plaintiff's fatigue] seems to [be] associated with this change. Rule out other etiology. Follow[]up in 4 to 6 weeks[.]" (AR 2663.) In his instructions for Plaintiff, Dr. Park wrote "[w]e will get . . . blood work to check . . . your fatigue . . . and [] potential causes for your sleepiness[,] but it may be like you said[,] that awkward transition between reducing your combustible marijuana and use of edible marijuana and some kind of dyssynergy with that[.]" (AR 2663-64.) Dr. Park told Plaintiff to "[h]ave a great time skiing" and "do not forget to wear a helmet[.]" (AR 2664.) At the time of the visit, Plaintiff was taking the following medications daily: one 40-milligram tablet of citalopram and one 20-milligram tablet of Adderall.

### F.    Plaintiff's Termination.

Verista terminated Plaintiff on February 18, 2022, because "his engagement ended with his client." (AR 2865.) There is no indication that Plaintiff asked for any accommodations during his employment with Verista for a physical, medical, or emotional condition. By the end of his employment, he had 25.4 hours of sick leave but "did not use any sick time with Verista." (AR 1951.) According to Verista's Human Resources Manager, Susan Proulx, Verista was "never aware [Plaintiff] was sick at any point during his employment[.]" (AR 2866.) Plaintiff proffers no evidence to the contrary.

### G.    Post-Termination Medical Care.

A few weeks after his termination, on March 9, 2022, Plaintiff received a CT scan of his chest, which resulted in "[n]o acute findings." (AR 2712.) The CT scan was ordered by Dr. Park in response to Plaintiff's February 15, 2022 complaint about a speck of blood in his phlegm. Shortly thereafter, on March 17, 2022, a physician assistant, Sarah Sprague, performed a clinical intake on Plaintiff, during which Plaintiff reported "vision change but . . . no dry eyes and no irritation[]" and "back pain but . . . no muscle aches[ and] no muscle weakness[.]" (AR 219.) After a physical examination, Ms. Sprague found Plaintiff had "good judg[]ment[,]" "normal mood and affect[,]" and "normal" recent and remote memory and was "active and alert[]" and "oriented to time, place, and person[.]" (AR 220.)

Nearly a month later, on April 14, 2022, Plaintiff went to the ED at SVMC for abdominal and back pain and diarrhea. Plaintiff reported that while his pain was "currently 2 out of 10[,]" his back and lower abdomen pain the previous night "was 10 out of 10[]" and "he tried a THC tincture which did not help[.]" (AR 395.) Plaintiff had "small blood[]" in his urine, and the physician assistant attributed Plaintiff's symptoms to "a [kidney] stone that he had passed." *Id.* The physician assistant found Plaintiff's "labs were overall non[-]concerning" and Plaintiff's blood tests and imaging "look[ed] good[.]" (AR 395-96.)

11

Approximately two weeks later, on April 29, 2022, Plaintiff saw Dr. Park "for [a] follow-up of hospitalization [ED] visits and multiple other issues" and reported, among other things, that he was having back and hip pain, experiencing fatigue, and struggling with his short-term memory. (AR 2656.) Plaintiff told Dr. Park that "he physically feels different every[ ]day and it has gotten better since Wednesday[]" and that he was micro-dosing with cannabis, smoking "0.04 g[rams] several times per day." *Id.* Dr. Park made referrals for Plaintiff, including for a Montreal Cognitive Assessment ("MoCA") and to see an ophthalmologist, audiologist, and ENT specialist. A few days later, on May 4, 2022, Dr. Park conducted a MoCA on Plaintiff, and Plaintiff scored a 29 out of 30, indicating no cognitive impairment.

A couple weeks later, on May 16, 2022, Plaintiff saw Dr. Dagmar Tobits for a tick bite. After Dr. Tobits removed the tick, he prescribed Plaintiff Doxycyklin. He noted that Plaintiff had "[n]o fever, no arthralgias, [and] no rashes." (AR 843.)

That same month, on May 24, 2022, Plaintiff visited Dr. Park "for [a] follow-up of blood work, fatigue[,] malaise[,] etc." (AR 2638.) Plaintiff reported "brain fog[]" and "fatigue" and that he "[c]rashes daily[,]" "[s]ees white[,]" has a "metallic taste in [his] mouth[,]" and experiences tenderness and "[p]ins and needles." *Id.* Plaintiff told Dr. Park that "he is still struggling [with] no good days[;] however[, the] bad days are getting better, [and he] turned the corner last Thursday, he hopes." *Id.* Plaintiff reported that he needs to take naps for forty to one hundred and twenty minutes per day and that he experiences gagging and vomiting if he does not get appropriate sleep. Dr. Park found that Plaintiff was "healthy[]appearing[]" and in "mild distress; [p]retty much at baseline[,] just seems a little tired [and] a little anxious[.]" *Id.* (emphasis omitted). Plaintiff had a "[n]egative/normal tickborne illness panel[.]" *Id.* In his notes, Dr. Park stated that Plaintiff was "concerned about possible long COVID" even though Plaintiff had "no known COVID infection." *Id.*

The Centers for Disease Control and Prevention defines and describes long COVID as follows:

12

Some people who have been infected with the virus that causes COVID[] can experience long-term effects from their infection, known as [l]ong COVID or Post-COVID Conditions (PCC). Long COVID is broadly defined as signs, symptoms, and conditions that continue or develop after acute COVID[] infection.

***

Long COVID is a wide range of new, returning, or ongoing health problems that people experience after being infected with the virus that causes COVID[].

***

People who experience [l]ong COVID most commonly report:

**General symptoms (*Not a Comprehensive List*)**

- Tiredness or fatigue that interferes with daily life
- Symptoms that get worse after physical or mental effort . . .
- Fever

**Respiratory and heart symptoms**

- Difficulty breathing or shortness of breath
- Cough
- Chest pain
- Fast-beating or pounding heart (also known as heart palpitations)

**Neurological symptoms**

- Difficulty thinking or concentrating (sometimes referred to as "brain fog")
- Headache
- Sleep problems
- Dizziness when you stand up (lightheadedness)
- Pins-and-needles feelings
- Change in smell or taste
- Depression or anxiety

**Digestive symptoms**

- Diarrhea
- Stomach pain

**Other symptoms**

- Joint or muscle pain
- Rash
- Changes in menstrual cycles[.]

(AR 78-80) (emphasis in original).

Almost a month later, on June 20, 2022, Plaintiff visited the ED at SVMC,
complaining of "'100 days' of blurred vision." (AR 691.) The ED doctor's note described
Plaintiff's reported symptoms as follows:

> [Plaintiff] states that his blurred vision generally occurs between 9 and 9:30
> PM[] and is brought on by bright light. He states that he notices a white
> light in his vision which is somewhat bothersome. He states that this
> generally resolves after a few hours. He sometimes has episodes in the
> afternoon as well. He states that since Thursday, 4 days ago, he seems to be
> having the symptoms more frequently. He does not report significant
> photophobia. He also reports an episode several weeks ago of "dense pain"
> in his right eye. He states that his vision sometimes seems blurry, but is
> usually normal. He denies any significant headaches, denies any
> numbness/tingling/weakness/balance disturbance. . . . He does sometimes
> have intermittent nausea but no vomiting. . . . No chest pain or shortness of
> breath. No neck pain.

*Id.* The ED doctor conducted a physical examination of Plaintiff and found that he was
well nourished, awake, alert, and in no acute distress. A CT scan of Plaintiff's head and
lab tests were normal. The ED doctor observed it was "[u]nclear what exactly is causing
[Plaintiff]'s symptoms, but in discussion with teleneurology, it seems that functional
neurologic dysfunction is certainly a strong possibility." (AR 696.) In his discharge
instructions, the ED doctor wrote: "There is no evidence of [a] mass or abnormality on
your head CT [scan]. Your labs values are very reassuring, your inflammatory markers
were negative. We have not identified a cause for your symptoms, but we have ruled out
a number of worrisome conditions." (AR 697.)

The same day, on June 20, 2022, Plaintiff had a telehealth consultation with a
neurologist for photophobia, during which Plaintiff reported having "episodic
photophobia and brain fog for the last 4 months[,]" "COVID about 6 months ago
and . . . 'long COVID' for the last 4 months[,]" some seizures in the past, and "a kidney

14

stone last month." (AR 2455.) The neurologist noted that Plaintiff's wife/ex-wife stated Plaintiff is "a daily heavy-duty cannabis user." *Id.* The neurologist was unable to examine Plaintiff because he had a bandanna over his face and eyes. Claiming the light hurt his eyes, Plaintiff refused to remove it. The neurologist nonetheless found that Plaintiff had "[n]ormal memory, attention, language, [and] orientation[,]" (AR 2456), and a CT scan of Plaintiff's brain performed on the same day was normal and showed "[n]o evidence of an acute intracranial abnormality." (AR 720.)

The following day, on June 21, 2022, Plaintiff visited an ophthalmologist for photophobia and told the doctor that his "photophobia is worsened by bright lights and . . . sunlight[]" but was "mild in severity." (AR 2281.) In the "history of present illness" section, the ophthalmologist recorded that Plaintiff reported the following:

> [Plaintiff] states that for 101 days his eyes have been very painful towards light, says that computer screens and other artificial lights are worse. [Plaintiff] [s]tates [that] 7 weeks prior to this light sensitivity he had COVID and thinks [his photophobia] may be something lasting from that. [Plaintiff] [s]ays [that] when he looks at the lights he will have seizures[] and states he[']s had hundreds of seizures over the past 100 days. . . . [Plaintiff says] [e]xposure to light caus[es] gagging and nausea. . . . No history of headaches.

*Id.* The ophthalmologist's evaluation of Plaintiff concluded that his pupils, optic discs, and retina and vessels were normal and that he appeared "well nourished[]" and "alert and oriented" with "no acute distress." (AR 2282.) The ophthalmologist's diagnoses of Plaintiff were ocular migraines and cataracts.

Two days later, on June 23, 2022, Plaintiff returned to the ED at SVMC for photophobia, reporting "ongoing and worsening symptoms of photophobia and eye pain." (AR 1109.) Plaintiff claimed his symptoms had been "ongoing for '107 days' in the aftermath of a COVID infection[]" but that "this seems like it started when he had a kidney stone approximately [one] month ago[.]" *Id.* Dr. Oliver Barnyak noted that Plaintiff "report[ed] no history of headache[ and] no history of migraines[]" and that "[i]n the last 3 days, [Plaintiff] has been seen by an ophthalmologist, [who] reports that [Plaintiff's] eyes were fine." *Id.* Dr. Barnyak concluded the following: "At this time,

15

discharge home with no clear diagnosis beyond [Plaintiff's] symptoms of photophobia. I do not believe that he is suffering a medical emergency[;] however[,] the etiology of his photophobia is unclear." (AR 1112.) Dr. Barnyak advised Plaintiff that "[y]ou are safe to go home. It is unclear the source of your aversion to light[]" and that "[i]t may help with your photophobia and retching to reduce your marijuana use." (AR 1113.) A few days later, on June 26, 2022, Plaintiff received an MRI on his brain, and the results were unremarkable.

Shortly thereafter, on June 30, 2022, at Plaintiff's request, Dr. Park referred Plaintiff to the long COVID clinic at Dartmouth-Hitchcock. In the referral, Dr. Park provided a diagnosis of "[u]nspecified visual disturbance[.]" (AR 797.) On July 20, 2022, the Director of Dartmouth-Hitchcock's long COVID clinic, Jeffrey Parsonnet, denied the referral as follows:

> We request documentation of the prior COVID [] infection . . . . We would consider scheduling [Plaintiff] after we have this documentation, or an office or hospital note describing [Plaintiff]'s initial illness. Also, it is not clear from documentation provided as to why [Plaintiff] is being referred – what symptoms he is having that could be related to COVID. His prior mental health issues are noted.

(AR 2006.)

Approximately one month later, on August 17, 2022, Plaintiff applied for Social Security Disability benefits. On his application, Plaintiff wrote, "my family thinks I[']m crazy. I think I have long[]COVID." (AR 265) (capitalization removed). Plaintiff's Disability Determination Explanation summarized the disabilities and timeline that Plaintiff alleged in his application as follows:

> The individual filed for Initial claim for disability on 08/17/2022 due to the following illnesses, injuries, or conditions: myalgic encephalomyelitis/chronic fatigue syndrome, post-exertional malaise, difficulty breathing or shortness of breath, chest pain – inflammation of heart, fast-beating or pounding heart, pins-and-needles feelings, joint and muscle pain, long[]COVID, difficulty thinking or concentrating "Brain Fog[,]"[] and anxiety[.]
>
> The individual alleges inability to function and/or work as of: 02/26/2022[.]

(AR 181) (emphasis omitted).

16

During the following month, on September 14, 2022, Plaintiff was seen by a nurse practitioner, Lisa Moulton, to "establish care" and for a "clinical intake[.]" (AR 2355.) During that visit, Plaintiff reported that he was exposed to COVID in December 2021 and had obtained a referral for a long COVID clinic but the referral "was not followed through due to lack of pre[-]lab testing[.]" (AR 2358.) Plaintiff complained that he was experiencing "[m]ultiple post COVID [symptoms]" and "[f]atigue, . . . some intermittent lung heaviness, nasal blockages, [photophobia] . . . , heart palpitations, tingling in feet and hands, . . . [and] brain fog . . . , [which he] manage[s] through cann[a]bis." *Id.* Plaintiff indicated that he "needs [marijuana] to get [his] brain to work" and was "mak[ing] [his] own [marijuana] butter" and "using [a] THC vape pen[.]" *Id.* He also reported being without permanent housing and "couch[-]surfing[.]" *Id.* Nurse Moulton found that Plaintiff was "healthy[]appearing, alert, [and in] no acute distress" with "no confusion, visual disturbances, or weakness in the extremities." *Id.*

The following day, on September 15, 2022, Plaintiff returned to Nurse Moulton, complaining of similar issues and symptoms to those he presented on the preceding day. Plaintiff advised that "[h]e was [e]n route to Connecticut and then Florida to help his mother who has suffered a stroke." (AR 2629.) Nurse Moulton conducted a SARS-CoV-2 Spike AB COVID test on Plaintiff, which detected antibodies. Nurse Moulton's comments regarding the test noted that, "[t]his test will detect antibodies made against the spike protein due to vaccination or from a previous infection[,]" and thus, the "[r]esults cannot be used to diagnose acute [COVID] . . . infection." (AR 2454.) In her assessment/plan notes, Nurse Moulton wrote: "Adjustment Disorder with mixed anxiety and depression[.]" (AR 2629.)

Over a month later, on October 22, 2022, Plaintiff visited the ED at Delray Medical Center for "dental pain since last night[.]" (AR 2423.) In reviewing Plaintiff's symptoms, the doctor noted that Plaintiff had "no fever, no chills, no sweats, . . . no shortness of breath, no cough, . . . no nausea, . . . no headache, [and] no dizziness[.]" *Id.* After a physical examination, the doctor concluded that Plaintiff was "alert, [in] no acute distress[,]" and had "normal judg[]ment[] [and] normal psychiatric thoughts." (AR 2424.)

17

The doctor prescribed Plaintiff amoxicillin and chlorhexidine and advised him to follow up with a dentist or oral surgeon.

The following month, on November 3, 2022, Plaintiff saw a neurologist, Dr. Emma Weiskopf, for a consultation. Plaintiff reported that he had COVID in December 2021 and "his 'health went down' in February[,]" "[h]e developed eye pain which turned out to be a dental implant that came out[,]" and "[h]e developed light sensitivity and brain fog." (AR 2362.) Plaintiff complained that he was still experiencing brain fog, "a lot of fatigue[,]" and "a lot of pain when he is trying to go to sleep." *Id.* He also reported that he "was exposed to carbon monoxide ten years ago which gave him [poor] memory." *Id.* An examination of Plaintiff's nervous system, reflexes, motor skills, and mental status yielded normal results. Dr. Weiskopf concluded that Plaintiff "endorses a constellation of symptoms, none specifically neurological[,]" and "[h]is main symptom for referral was photophobia, thought to possibly be [a] migrainous variant that has in large part resolved." (AR 2363.) Plaintiff complained that "[h]e has not been seen yet" by Dartmouth-Hitchcock's long COVID clinic, and Dr. Weiskopf noted that "[h]e should go to his long [] [COVID] clinic appointment as most of what he reports he believes started when he had [COVID]." (AR 2362-63.) According to Dr. Weiskopf's notes, Plaintiff had stopped taking Adderall and was "currently not taking any medications." (AR 2362.)

Six days later, on November 9, 2022, Plaintiff visited Nurse Practitioner Gabriella Neacsu-Katz[3] to establish care and receive a referral to a long COVID clinic. Plaintiff complained of fatigue, gut pain, and "[s]uffering with residual [COVID] symptoms[.]" (AR 2037.) In her assessment, Nurse Neacsu-Katz noted that Plaintiff had "[u]ntreated anemia" and "[p]ost COVID unresolved symptoms[.]" *Id.* On the same day, Richard Root, Ed.D., performed a consultative examination of Plaintiff in connection with his Social Security Disability benefits claim. During Dr. Root's examination, Plaintiff reported that he left work in February 2022 because "he was not able to go to meetings and do job-related tasks." (AR 653.) Plaintiff, however, also "denie[d] ever having any

---

[3] In portions of the administrative record, Gabriella Neacsu-Katz is referred to as Gabriella Rus-Neacsu. Herein, she will be referred to as Nurse Neacsu-Katz.

18

work adjustment problems." *Id.* Plaintiff informed Dr. Root "that he uses cannabis oils, which is not prescribed, to help in a self-medicating way for pain[]" and that "[h]e has done so since April 2022." *Id.* Plaintiff reported "us[ing] cannabis several times a week for this reason." *Id.*

In his report, Dr. Root stated, "[Plaintiff] reports that his medical problems started in February 2022. He had COVID in December 2021 and then developed long COVID symptoms in February 2022[,]" and "[Plaintiff] said that he has had heart palpitations, but they seem more related to long COVID." (AR 652-53.) On Dr. Root's "Mini-Mental State Examination," Plaintiff scored a 23 out of 24, which "is broadly within normal limits." (AR 655) (capitalization removed).

Based on his assessment, Dr. Root provided the following diagnostic impressions:

- Attention deficit hyperactivity disorder [("ADHD")].
- Anxiety disorder with symptomatology increased secondary to medical problems.
- Rule out depressive disorder.
- Rule out cannabis use disorder.
- Rule out alcohol use disorder in self-reported sustained remission.

*Id.* Dr. Root concluded that Plaintiff's "psychological disorders mildly to moderately restrict his daily activities, . . . memory, and concentration[]" and recommended that Plaintiff receive long-term individual psychotherapy and psychopharmacological interventions targeting his anxiety. *Id.*

Shortly thereafter, on November 11, 2022, Plaintiff visited the ED at SVMC complaining that he "started having 9 out of 10 stabbing chest pain." (AR 517.) The ED performed a physical examination of Plaintiff, and the results were normal. An EKG showed Plaintiff had a "normal sinus rhythm at 62 beats per minute." (AR 519.) Five days later, on November 16, 2022, Plaintiff visited another doctor for heart palpitations.

On November 18, 2022, and November 23, 2022, respectively, Howard Goldberg, Ph.D., reviewed Plaintiff's medical records for mental impairments, and Edward Haak, D.O., reviewed Plaintiff's medical records for physical impairments in connection with

19

his Social Security Disability benefits claim. Dr. Goldberg and Dr. Haak diagnosed Plaintiff with severe chronic fatigue syndrome, severe ADHD, and severe anxiety and obsessive-compulsive disorders. They found that "[t]here is no evidence of any substance abuse disorder/[drug addiction and alcoholism] issue." (AR 179.)

Dr. Goldberg and Dr. Haak agreed that Plaintiff's "ability to maintain attention and concentration for extended periods" was "[m]oderately limited[,]" his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" was "[m]oderately limited[,]" and his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" was "[m]oderately limited[.]" (AR 178.) With respect to Plaintiff's concentration and persistence capacities, Dr. Goldberg and Dr. Haak found that Plaintiff was "[l]imited from 3+ step tasks and high production norm tasks[]" and that "[e]pisodic exacerbations in psych[ological] symptoms can temporarily undermine [his] cognitive efficiency. Otherwise, [Plaintiff] can sustain [concentration and persistence periods] over two[-]hour periods over [a] typical work[]day/week for simple 1-2 step tasks in [a] low production norm setting, with adaptive limitations[]." *Id.*

Thereafter, Plaintiff had a video consultation with Nurse Neacsu-Katz on November 23, 2022, during which she noted that Plaintiff "[h]ad labs done[,]" which resulted in "no unusual findings[,]" and that Plaintiff's EKG was "normal[.]" (AR 2036.) Nurse Neacsu-Katz found that Plaintiff was "[a]lert and oriented[.]" *Id.* She determined Plaintiff's "iron was low" and prescribed Plaintiff "Kap[p]Arest[,]" *id.*, a dietary supplement "designed to support a healthy inflammatory response, primarily through the modulation of NF-kappaB, a molecule inside each cell." *KappArest™*, Biotics Rsch., https://shop.bioticsresearch.com/products/kapparest (last visited February 18, 2026). In her assessment, Nurse Neacsu-Katz noted that Plaintiff had "[u]nexplained symptoms post [COVID]" and "[j]oint pains[.]" (AR 2036.)

The next month, on December 2, 2022, the Social Security Disability Examiner (the "Examiner") found that Plaintiff did not have the residual functional capacity to

20

perform his past relevant work, specifically his position as a "software engineer" at Verista, because his physical and mental residual functional capacity "limit [him] to unskilled work." (AR 179.) "Based on the documented findings," the Examiner concluded that Plaintiff was disabled for purposes of his Social Security Disability benefits claim. *Id.* The Social Security Administration ("SSA") thereafter sent Plaintiff a letter, informing him that "[it] found that [he] became disabled under [its] rules on February 26, 2022[,]" and he was therefore entitled to monthly disability benefits beginning in August 2022. (AR 1958.)

A week later, on December 9, 2022, Plaintiff had a telehealth visit with Nurse Moulton, complaining that his health was "askew" and that he was undergoing stress and having heart palpitations and breathing concerns at the rate of "one episode per day[.]" (AR 2624.) Nurse Moulton observed that "[Plaintiff's] behavior quickly escalated angrily regarding [the wait for the] long [COVID] clinic and the inability to get into [Dartmouth-Hitchcock's] long [COVID] clinic[.]" (AR 2625.)

Later that month, on December 20, 2022, a secretary at Dartmouth-Hitchcock Medical Center ("DHMC") entered the following clinical note:

> [Plaintiff] called very upset that his referrals keep getting denied from [Dartmouth Hitchcock's long COVID] clinic. [I t]ried explaining to [Plaintiff] why they were being denied and he kept interrupting. He proceeded to raise his voice towards me when I was trying to clarify and explain his denied referrals. [He i]nsisted that I ask Dr. Parsonnet what kind of testing he would [recommend] in his case to prove he had COVID, I agreed to do so.

(AR 2004.)

The following day, on December 21, 2022, Dr. Parsonnet denied Nurse Moulton's referral for Plaintiff, explaining: "This patient has been referred many times. I do not have evidence that he ever had COVID." (AR 2063.) On the same day, Dr. Parsonnet emailed Nurse Moulton the following:

> I would like to speak with you about your referral of [Plaintiff] to [Dartmouth Hitchcock's long COVID c]linic. I tried calling your office but was on permanent hold. Would you give me a call when you have a

21

minute? . . . [Plaintiff] has been calling our office and was verbally abusive
to one of our secretaries.

(AR 2003.)

Five days later, on December 26, 2022, Plaintiff had a video consultation with
Nurse Neacsu-Katz. Plaintiff reported "brain fog, shooting pain in legs/feet, [and] heart
palpitations[.]" (AR 2035.) Nurse Neacsu-Katz noted that Plaintiff "is very frustrated"
and "[t]alking fast without allowing [the] provider to explain the process required to be
seen at the post [COVID] clinic" and that Nurse Neacsu-Katz "explained we need a
positive [COVID] test to prove he had [COVID] prior to being seen at the post [COVID]
clinic." *Id.* Nurse Neacsu-Katz noted that Plaintiff was "[a]lert and oriented" and found
that he had "[p]ost [COVID] symptoms[.]" *Id.* Nurse Neacsu-Katz entered a lab order for
a COVID test, but it is not clear whether Plaintiff underwent testing because the result is
not contained in the administrative record.

The following month, on January 22, 2023, Plaintiff visited the ED at Baystate
Franklin Medical Center ("BFMC") for chest pain, and doctors conducted a COVID test,
which was negative, a chest x-ray, which was normal, and an EKG, which was normal. A
few days later, on January 25, 2023, Plaintiff returned to the ED at BFMC for chest pain.
Plaintiff reported "a past medical history including COVID infections in December 2021
[and] in February 2022, with reported symptoms worse after vaccination in December
2022." (AR 2169.) The ED doctor administered a COVID test, which was negative.
During this visit, Plaintiff expressed that he was struggling with "housing instability,
severe anxiety, [and] self[-]isolating" and "made vague suicidal statements[] but denie[d]
suicidal ideation[.]" *Id.* Due to mental health concerns, the ED doctor recommended
voluntary inpatient hospitalization. Plaintiff agreed to be admitted on a voluntary basis
and was released from BFMC on January 31, 2023. In the discharge notes, the ED doctor
stated:

> [Plaintiff] began treatment with fluoxetine [("Prozac")] 20 m[illi]g[rams]
> daily, which was later increased to 40 m[illi]g[rams] daily. He tolerated this
> with no side effects, and evidence of improvement. He was also treated
> with diazepam 5 m[illi]g[rams] 3 times a day, with good effect, and much

22

more effect at 7.5 m[illi]g[rams] 3 times a day. The combination of these 2 medications led to nearly complete resolution of his anxiety symptoms. Over the past year, when having panic attacks, [Plaintiff] was convinced that he would die, and there was a question about whether this was a psychotic symptom. However, after treatment of anxiety, there is no evidence of any psychotic symptoms, and it now seems likely that the symptoms were better explained by the panic disorder criterion, "fear of dying," rather than psychosis. It is also possible that [Plaintiff's] chronic use of cannabis oil contributed to previous psychotic symptoms, which have now resolved.

(AR 2162-63.)

The next month, on February 17, 2023, Nurse Neacsu-Katz completed a physician statement with the Teachers Insurance and Annuity Association of America for Plaintiff's claim to waive the premium on his life insurance. In the form, she noted that Plaintiff had symptoms of long COVID since December 24, 2021, and made no mention of Plaintiff's marijuana use.

On February 20, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz, during which he reported "episodes of photophobia" and that he received a COVID booster December 15, 2022, which initially made him "fe[el] better[]" but "within 3 days[, his] episodes returned[.]" (AR 2034) (internal quotation marks omitted). Nurse Neacsu-Katz noted that Plaintiff was "[a]lert and oriented[,]" and in her assessment, "[Plaintiff] is stable[.]" *Id.*

The following month, on March 2, 2023, Plaintiff visited the ED at DHMC for photophobia and diffuse pain. The ED doctor noted Plaintiff's symptoms as follows:

[Plaintiff] reports he had COVID in December 2021 and was subsequently diagnosed with "long COVID" [] involv[ing] symptoms of fatigue and brain fog. In June 2022[,] [Plaintiff] developed episodic photophobia. He was evaluated by DHMC neurology. He received a head CT without any clear acute abnormalities. Furthermore, [Plaintiff] reports he received a brain MRI that was read as "unremarkable." . . . [Plaintiff] states that [his] episodic photophobia resolved. However, in December 2022 – following his COVID booster – he developed persistent photophobia that now requires him to cover his eyes with a hat plus sunglasses. [Plaintiff] denies any headaches but endorses a sensation of deep pain throughout his whole body after he sees light. He also intermittently sees stroking lights. He

> denies any phonophobia or neck stiffness. . . . [Plaintiff's e]x-wife is
> concerned because [Plaintiff] stated last night that pain is unbearable and he
> wants to die. [Plaintiff] denies any active suicidal ideation or plan to
> commit suicide.

(AR 1968.) After reviewing Plaintiff's prior records and conducting a physical

examination, the ED doctor concluded the following:

> [Plaintiff]'s symptoms are most suspicious for sequelae of his complex
> psychiatric history. No active concern for meningitis given patient is
> afebrile without any neck stiffness. Additionally, no active concern for
> central neurologic problem given prior reassuring head imagining and
> absence of any motor/sensory dysfunction or acute weakness. Photophobia
> plus oral is suspicious for migrainous variant, but this would not explain
> [Plaintiff]'s complaints of whole body pain after seeing light.

(AR 1969.) Because the ED doctor found "[i]t is most likely that [Plaintiff's] symptoms

are a manifestation of [his] known psychiatric conditions[,]" she referred Plaintiff to

DHMC's Department of Psychiatry. (AR 1984.)

A few weeks later, on March 23, 2023, Plaintiff had a video consultation with

Nurse Neacsu-Katz. During the consultation, Plaintiff reported that he was trying to gain

weight because his weight was "down to 139 [pounds]" and that he had been taking

Prozac for six to eight weeks which was causing "episodes of pressure and pain in [his]

eyes[.]" (AR 2032.) Nurse Neacsu-Katz noted that Plaintiff was "[a]lert and oriented"

and "[c]alm[,]" and in her assessment, she wrote Plaintiff had "low" energy and was

"[r]equesting to wean off [Prozac.]" *Id.* Per his request, Nurse Neacsu-Katz reduced

Plaintiff's daily dose of Prozac to 30 milligrams.

Plaintiff returned to Nurse Neacsu-Katz for a video consultation on April 6, 2023.

During the consultation, Plaintiff reported that he stopped taking Prozac five days prior

and "ha[d] not felt any side effects[.]" (AR 2031) (internal quotation marks omitted).

Plaintiff reported that he took Diazepam "maybe 1-2 times per week" and "[u]ses

[m]arijuana oils to help with anxiety[.]" *Id.* Plaintiff reported that he "lose[s] [his]

eyesight for 2 hours" but his "[m]uscles, joints[,] and digestive system [were] great[.]" *Id.*

(internal quotation marks omitted). Nurse Neacsu-Katz noted that Plaintiff wore "dark

sunglasses" during the consultation, but he was otherwise "[a]lert and oriented[.]" *Id.* In

her assessment, Nurse Neacsu-Katz wrote that Plaintiff had "[s]ensitivity to light" but his "[m]ood [was] stable[.]" *Id.* Nurse Neacsu-Katz recommended that Plaintiff make an appointment with an ophthalmologist, and thereafter, Plaintiff visited an ophthalmologist for photophobia on April 11, 2023.

### H.   Plaintiff's Notice of Claim.

On April 11, 2023, Plaintiff emailed Ms. Proulx as follows:

I am a former employee of Verista.

I came down with [l]ong[ COVID] while working at Verista.

My last day at Verista was February 18th, 2022.

Yesterday, I filed a long-term disability claim with Equitable.

They informed me that they are processing the claim, however, the Hawkins Point disability policy was cancelled in January of 2022.

I see on my [exit] papers that Lincoln Financial is listed as the Disability insurer for Verista.

Am I to file with Lincoln?

(AR 2869-70.)

Later that month, on April 20, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz. Nurse Neacsu-Katz noted that Plaintiff was "[e]valuated by [an] ophthalmologist [and] diagnosed with ocular migraines[.]" (AR 2030.) Plaintiff reported that his "[e]nergy 'is getting better'" but he still had "[t]wo episodes per day when his eyes hurt[.]" *Id.* Nurse Neacsu-Katz found that Plaintiff was "[a]ble to talk on video camera without dark glasses" and was "[a]lert and oriented[.]" *Id.* In her assessment, Nurse Neacsu-Katz noted "[b]rain fog[,]" "[d]igestive symptoms improved[,]" "[e]nergy improved[,]" and "[m]ood stable[.]" *Id.* Nurse Neacsu-Katz diagnosed Plaintiff with ocular migraines and stated she would follow up in one month.

The next day, on April 21, 2023, DHMC's Department of Psychiatry denied Plaintiff's referral, explaining that "[t]he demand for our general adult outpatient psychiatry and therapy services exceeds our capacity." (AR 1966.)

25

## I.    Plaintiff's Claims with Lincoln and Verista Under the Plans.

On April 25, 2023, Plaintiff submitted an initial claim to Lincoln and Verista,[4] stating that his reasons for an inability to work were "Long[][COVID] – Brain Fog, Cognitive Decline, Chronic Fatigue Syndrome, Nerve Pain, [and] Vision Loss." (AR 2880.) In connection with his application for benefits, Nurse Neacsu-Katz submitted a physician's statement, dated April 24, 2023, wherein she diagnosed Plaintiff with long COVID and ocular migraines. She also stated that Plaintiff's symptoms first appeared on December 25, 2021, and that he incurred a reduced ability to work as of January 1, 2022. Nurse Neacsu-Katz wrote that Plaintiff had "[l]ow energy, sensitivity to light, [and] memory loss" and "cannot stand for periods" nor "focus for long periods of time[.]" (AR 2889.) She did not mention Plaintiff's marijuana use and described Plaintiff's symptoms as: "Fatigue, Brain Fog, Underweight, Vision Loss, Generalized Pain, Nerve Pain in Feet and Hands." (AR 2888.) In a section of the form titled "Objective Findings (include copies of any x-rays, laboratory data, EKG's, MRI's, scans[,] and any clinical findings)[,]" Nurse Neacsu-Katz wrote "1. Difficulty focusing[,] 2. Unable to walk on heels[,] 3. Wears dark glasses during video consultation due to sensitivity to light[,] 4. Memory loss[.]" *Id.*

On May 11, 2023, Verista sent Plaintiff a letter denying his STD claim.[5] Verista explained that an employee's benefits under the STD terminate when "the date [of] employment terminates[,]" and "[Plaintiff's] date of disability [was] February 19, 2022 and [he was] terminated on February 18, 2022[.]" (AR 2850.) In its denial letter, Verista

---

[4] The administrative record and the parties' Statements of Facts are ambiguous as to whether this initial claim operated as Plaintiff's application for benefits under both the STD and LTD. The claim form is on Lincoln's letterhead and is titled "Long Term Disability Claim Form Statement Of Employee[,]" but the Administrative Record does not contain a separate claim for Plaintiff's application under the STD. (AR 2880.)

[5] Decisions denying Plaintiff benefits under both Plans were issued by Lincoln on Lincoln's letterhead; however, the STD determinations are referred to as Verista's decisions because, as Verista acknowledges, "Verista ultimately made the decision to deny STD benefits and Lincoln's communications were made on Verista's behalf." (Doc. 42 at 1 n.1.)

advised Plaintiff that he could seek review of the denial by written request and such a request should include the following supplemental documentation:

> Proof that you were not terminated on February 18, 2022 and that you were continuously disabled through at least February 24, 2022. Copies of all office treatment notes, diagnostic test results, prescription histories, treatment plans, physical therapy records, procedure or operative reports, and any hospital discharge summaries from February 19, 2022 to present. This medical information is needed from all treating providers, specialists, or therapists. Along with any additional information or specific restrictions and limitations established with the objective evidence to support disability.

(AR 2852.)

On June 7, 2023, Plaintiff emailed Lincoln to appeal the denial of STD benefits, claiming that his "medical records show that [he] became ill prior to [his] termination date[.]" (AR 2851.) The following month, on July 19, 2023, Verista sent Plaintiff a letter, affirming its decision to deny him STD benefits, reasoning: "Following the review, your former employer confirmed that your termination date from Verista was February 18, 2022. Since your date of disability was February 19, [2022], which was after your last day of employment, your claim ha[s] been denied with no benefits payable." (AR 2250.) Verista also noted that Plaintiff provided "no new/additional medical evidence" and "no new information regarding [his] termination" in connection with his request for reconsideration. (AR 2251.)

On May 12, 2023, Lincoln sent Plaintiff a letter regarding his claim for LTD benefits, informing him that it needed more documentation to determine whether his injury was considered a "Pre-Existing Condition" under the LTD and thus excluded from coverage. (AR 2843) (internal quotation marks and emphasis omitted). Shortly thereafter, on May 15, 2023, Lincoln sent Plaintiff another letter explaining that his claim for LTD benefits was untimely and requiring that he submit "a letter explaining in detail the reason for filing so late." (AR 2820.) Plaintiff submitted additional documentation to Lincoln, including a response to a questionnaire furnished by Lincoln, dated May 30, 2023. In his response, Plaintiff indicated that he has been hospitalized for long COVID, that he "ha[s] episodes multiple times per day, each episode caus[ing] [him] to lie down

27

on the ground for 20 minutes to 2 hours[,]" and that his "memory is not good and []
vision is shot." (AR 2765.)

The next month, on June 27, 2023, Lincoln sent Plaintiff a letter informing him
that his claim for LTD benefits was denied. Lincoln explained its reasons for denial as
follows:

> We asked for any and all pharmacy records, medical records, treatment
> notes, and explanation of benefits from all healthcare carriers, pharmacies,
> and providers from March 1, 2021 to present in order to determine if your
> condition is pre-existing and also disabling to the point you would be
> precluded from performing your own occupational duties. We asked that all
> requested information be sent to us no later than June 25, 2023.
>
> ***
>
> To date, we still have not received the requested medical records from
> [BFMC] and Dr. Paul Morrissey by the June 25, 2023 deadline. Neither
> facility would verify any dates of service or give any information over the
> phone. Therefore, your claim is denied. Once all requested information is
> received, your claim will be reviewed to determine if your condition for
> which you are claiming disability is pre-existing and also disabling.
>
> In our review of your claim, [Lincoln] has fully considered the [SSA]'s
> ruling to approve Social Security Disability benefits. It should be noted,
> however, that while we have fully considered the [SSA]'s ruling, the
> decision by the [SSA] does not determine entitlement to benefits under the
> terms and conditions of [the LTD].

(AR 2260-61.) On July 19, 2023, Lincoln sent Plaintiff another letter stating that his
claim for benefits under the LTD was denied, stating "[s]ince your date of disability is
February 19, 2022 and you were terminated on February 18, 2022, we are unable to
approve your claim." (AR 2256.)

In connection with Lincoln's separate review of Plaintiff's life insurance waiver of
premium benefit, Lincoln's Nurse Disability Consultant, Christy,[6] RN, provided an
internal memo for Lincoln. In her memo, dated August 3, 2023 the Nurse Disability
Consultant opined:

> Based on the available medical records, there is no evidence of functional
> impairment to warrant [restrictions and limitations] to be supported beyond

---

[6] The administrative record only identifies the Nurse Disability Consultant by her first name.

28

2/18/22. Although [Plaintiff] is reporting symptoms starting in 12/2021, [he] continued to work up until his termination[,] which does not indicate a severity that prevented him from working. Beyond 2/18/22[,] [Plaintiff] has had multiple tests, imaging[,] and referrals to specialists which have all been normal[,] and no significant abnormal exam findings are noted. There has been no official cognitive testing showing evidence of cognitive impairment or memory deficits. The [o]phthalmology, [n]eurology[,] and [c]ardiology specialists advised no treatment is needed[,] and [Plaintiff] was denied admission to the [l]ong COVID clinic due to lack of evidence that [he] had COVID.

(AR 2951.)

### J.    Plaintiff's Appeal and Independent Review.

On January 2, 2024, through his attorney, Plaintiff appealed Verista's and Lincoln's denials of STD and LTD benefits. In connection with the appeal, Verista and Lincoln retained independent board-certified physicians, Neema Hooker, M.D., and Frank Gantz, Psy.D., to review Plaintiff's medical records from early 2020 to late 2023.

In her clinical review memo, dated March 20, 2024, Dr. Hooker diagnosed Plaintiff with depression, anxiety, and hypercholesterolemia. Dr. Hooker determined that the medical records reviewed did not support the restrictions and limitations "that were recommended by treating providers for the time frames in question[]" and that it was unclear whether "the medical management recommended by the provider[s] and/or followed by [Plaintiff] [was] clinically reasonable and consistent with the apparent level of severity for the reported condition[.]" (AR 92-93.) Dr. Hooker concluded that "[b]ased on the review of the available medical records, no physical [restrictions and limitations] can be reasonably supported from 02/[]18/2022 to present or ongoing." *Id.* In connection with her report, Dr. Hooker called Nurse Neacsu-Katz three times, but each call went unanswered.

On March 27, 2024, Nurse Neacsu-Katz responded to Dr. Hooker with a letter, which states in relevant part:

[Plaintiff] . . . has been under my care since 11/09/2022.

I have evaluated and treated [Plaintiff] for the following conditions: long [COVID] symptoms, anxiety, depression, brain fog, digestive symptoms, dysautonomia, and ocular migraines.

> During many of the consultations I have done with [Plaintiff], he was
> l[]ying flat on the floor, the only position he could be in (wearing shades
> due to ocular migraines). I observed him on video, sobbing from "tired of
> feeling sick."
>
> There has been gradual improvement in his condition: able to spend one
> hour per day on the computer, able to go for short walks, mood has
> improved, and digestive symptoms are minimal. [He c]ontinues to
> experience one to two episodes per day where he feels "barely functional."
> He must stop and l[ie] in bed and rest until all symptoms go away. Episodes
> would happen 4-6 times daily in the past.

(AR 135.) The following day, on March 28, 2024, Dr. Hooker confirmed that Nurse

Neacsu-Katz's letter did not alter her conclusions because Nurse Neacsu-Katz's letter

provided "several non-specific subjective symptoms noted by [Plaintiff]; there [are] no

supporting objective measures." (AR 100.)

In his clinical review memo, dated April 1, 2024, Dr. Gantz diagnosed Plaintiff

with persistent and "severe" somatic symptom disorder, "severe" cannabis use disorder,

and unspecified mood disorder with anxiety, panic attacks, and possible mood swings.

(AR 124.) Dr. Gantz made the following findings:

> - The documents reviewed supported ongoing severe [s]omatic
>   symptom disorder with anxiety and preoccupation regarding illness,
>   in particular "long C[OVID,]"[] and a variety of other somatic
>   complaints which have would have resulted in significant psychiatric
>   impairment. A severe [c]annabis use disorder is also evident. Both
>   are impairing.
>
> ***
>
> - [Plaintiff]'s main focus of concern was "long C[OVID.]"[]
>   However, there was no clinical evidence to support anything beyond
>   a mild case of self-reported C[OVID] in December 202[1] (notes of
>   01/31/2023). Yet, [Plaintiff] reported having seizures and
>   convulsions which he attributed to C[OVID]. In addition, [Plaintiff]
>   received a Johnson & Johnson C[OVID] vaccine in June 2021
>   which, according to Dr. Parsonnet at the Dartmouth[-]Hitchcock . . .
>   [l]ong C[OVID c]linic, made testing for exposure impossible.
>   [Plaintiff] was thus denied admission to their program[,] which
>   resulted in him becoming verbally abusive to clinical care staff and
>   secretarial staff in at least three different settings[.]
>
> ***

30

- Of greatest concern, throughout the records, it is noted that [Plaintiff] "self-medicated" on a daily basis with THC oils or THC edibles. The dosages reported ranged anywhere from 50 m[illi]g[rams] to 600 m[illi]g[rams] of THC oil daily (01/31/2023; 11/03/2022[]; 02/15/2022). Furthermore, [Plaintiff] also claimed to mix his own drug cocktails to simulate THC (09/01/2023). Yet, there was no referral for substance abuse evaluation or treatment and only emergency psychiatric care documented.

- As noted . . . , these are very high concentrations of THC and can result in significant memory impairment, loss of coordination, and substantial physical reactions including nausea, lethargy, and heart palpitations. All of these were complaints that [Plaintiff] presented at various [EDs] and to at least 71 medical and mental health consultants.

(AR 126-27.)

With respect to whether Plaintiff's disability was caused by a pre-existing condition, Dr. Gantz explained:

- [Plaintiff] received care during [the period of 5/30/2021 through 8/29/2021] for diagnoses identified as "anxiety, depression/hysteria or both[,]" and ADHD. Treatment included prescriptions written by Dr. [] Park for citalopram, Abilify, and guanfacine documented on 05/29/2021. Guanfacine was changed to Adderall on 06/17/2021. Citalopram, Abilify, and Adderall continued to be documented as prescribed for the above disorders on 06/30/2021, 07/24/2021, and 08/25/2021.

- Hysteria is an antiquated diagnostic term that preceded current nomenclature for [s]omatic symptom disorder. Both include a preoccupation with physical illness and symptoms that can vary in intensity and focus over time. Significant anxiety is associated with the somatic preoccupation[,] and depression is also common in individuals with this disorder. Medications prescribed by Dr. Park would have been intended to address all three of these components. Standard of care for this disorder includes intensive psychotherapy and[,] in severe cases, referral to [an Intensive Outpatient Program] or [Partial Hospitalization Program]. [Plaintiff] was noted by Dr. Park to be in counseling[;] however[,] there was no documentation of psychotherapy or counseling available for review. There was no evidence of escalation to a higher level of care by any of his providers.

31

(AR 125-26.)

Dr. Gantz found that Plaintiff's "[m]edical records are adequate to support [restrictions] and [limitations] of no more than activities of daily living[]" and that the medical management recommended by providers to Plaintiff was not clinically reasonable or consistent with the apparent level of severity for Plaintiff's reported conditions. (AR 124.) Dr. Gantz concluded, "[Plaintiff] has had substantial medical evaluation for a variety of disorders[,] all of which were not impairing or [were] unremarkable." (AR 125.)

After receiving Dr. Gantz's report, Lincoln asked him to clarify the date on which Plaintiff's restrictions and limitations began. In response, Dr. Gantz provided the following:

- Medical records are adequate to support [restrictions] and [limitations] of no more than activities of daily living due to psychiatric diagnoses of . . . [:] [s]omatic symptom disorder, persistent, severe . . . [;] [c]annabis use disorder, severe . . . [;] [u]nspecified mood disorder with anxiety, panic attacks[,] and possible mood swings from 10/22/2022 through 12/29/2023.

- Documentation did not support impairment from 02/[]18/2022 through 10/21/2022 because [Plaintiff] was documented as having traveled to Florida, was not engaged in high[-]frequency medical help seeking or [ED] visits, had normal Mental Status Examination findings during medical visits, and a normal score on the M[o]CA[.]

(AR 105.)

On April 3, 2024, Lincoln provided Plaintiff with the opportunity to comment on Dr. Hooker's and Dr. Gantz's memos. On April 4, 2022, Plaintiff did so, asserting that they "only consider[ed] medical records selectively[]" and arguing that his disability and symptoms started on February 15, 2022. (AR 61.) On April 9, 2024, Verista denied Plaintiff's claim for STD benefits and Lincoln denied Plaintiff's claim for LTD benefits. In its denial of benefits under the STD, Verista explained its decision as follows:

[T]he information does not contain significant physical or mental status exam findings, diagnostic test results, or other forms of medical documentation to verify that his impairments and symptoms were of such severity, frequency, and duration that they rendered him unable to perform

the material and substantial duties of his job as of February 18, 2022. There remains insufficient medical evidence to substantiate that [Plaintiff] met the definition of disability prior to his termination date.

(AR 54.)

In denying benefits under the LTD, Lincoln's reasoning was threefold. First, "[t]here remains insufficient medical evidence to substantiate that [Plaintiff] met the definition of disability prior to his February 18, 2022 termination date." (AR 34.) Second, Plaintiff's medical records "d[id] not contain significant physical or mental status exam findings, diagnostic test results, or other forms of medical documentation to verify that his impairments and symptoms were of such severity, frequency, and duration as to result in restrictions or limitations rendering him unable to perform the duties of his occupation throughout and beyond the [LTD]'s elimination period." *Id.* Finally, Plaintiff's treatment for various medical conditions prior to his employment rendered his alleged disability a pre-existing condition, and, therefore, Plaintiff was excluded from coverage under the LTD. As Lincoln observed, "[Plaintiff] received treatment within three months prior to his effective date of coverage for the diagnoses identified as anxiety, depression, hysteria, and ADHD, and he was therefore excluded from coverage related to these diagnoses." *Id.*

With respect to Nurse Neacsu-Katz's opinions, Lincoln explained:

The information on file indicated that [Plaintiff] claimed disability related to a constellation of physical and mental symptoms attributed to [l]ong COVID[.] [W]hile his complaints were acknowledged, there were no documented incapacitating levels of functioning documented on exam, or significant abnormalities documented on diagnostic testing, to substantiate sustained and continuous restrictions and limitations at or around February 18, 2022. While [Nurse Neacsu] Katz, NP began treating [Plaintiff] on November 9, 2022 for reported [l]ong COVID symptoms, and she endorsed his absence from work[,] the associated treatment notes contained very limited exam findings. There were no significant physical exam abnormalities documented, nor were deficits in cognition, memory, or concentration indicated. Based on the available medical records, it was concluded there was adequate documentation to support restrictions and limitations of no more than activities of daily living due to the psychiatric diagnoses from October 22, 2022, through December 29, 2023 only.

(AR 34.)

In both decisions denying Plaintiff benefits under the Plans, Verista and Lincoln explained why they did not follow the SSA's disability determination as follows:

> In our review of the claim[s], [Verista and] Lincoln did fully consider the [SSA]'s ruling to approve Social Security Disability Income benefits. It should be noted, however, that while we fully considered the [SSA]'s ruling, the decision by the [SSA] does not determine entitlement to benefits under the terms and conditions of the [STD and LTD]. Moreover, [Verista and] Lincoln ha[ve] obtained and considered medical assessments that were not considered by the [SSA] in its determination process.

(AR 34, 54.)

### K.    Plaintiff's Post-ERISA Claim Medical Care.

The court notes that the administrative record contains a number of medical records pertaining to medical visits after Plaintiff submitted his claims under the Plans. These records are relevant to Plaintiff's credibility in self-reported symptoms and Nurse Neacsu-Katz's reliability as a treating physician.

On May 15, 2023, Plaintiff had a video treatment visit with Nurse Neacsu-Katz wherein he reported that his "vision is getting continually worse" and that he had "[p]ain [in his] right elbow for about one month[.]" (AR 2029) (internal quotation marks omitted). Nurse Neacsu-Katz noted Plaintiff was "[a]lert and oriented" but "[w]earing dark glasses during [the] video session[.]" *Id.* In her assessment, Nurse Neacsu-Katz wrote "[t]endonitis right elbow[,]" "[m]ood stable[,]" "[v]ision unchanged[,]" and "[e]nergy improved[.]" *Id.*

A few weeks later, on June 7, 2023, Plaintiff was seen by an ophthalmologist for blurred vision. The following week, on June 15, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz, reporting that he was "[c]oming out of a flare-up and . . . learned a lot[,]" "[s]tart[ing] on a protocol by a functional medicine doctor[,]" "start[ing] to jog[,]" and "[t]aking certain probiotic[s.]" (AR 2028.) Nurse Neacsu-Katz noted Plaintiff was "[a]lert and oriented[,]" although his "[l]ong [COVID] symptoms persist[.]" *Id.*

On July 10, 2023, Plaintiff followed up with Nurse Neacsu-Katz via video, reporting "eye issues[,]" "[d]oing a 3[-]day[] fast" to alleviate long COVID symptoms,

and "[s]tart[ing] on [a n]icotine protocol[.]" (AR 2019) (internal quotation marks omitted). Nurse Neacsu-Katz noted that Plaintiff was "[a]lert and oriented" and his "[s]ymptoms are improving[.]" *Id.* Nurse Neacsu-Katz stated that she offered Plaintiff "[e]motional support[.]" *Id.* Plaintiff requested "to try the [d]oxycycline protocol for long [COVID,]" and Nurse Neacsu-Katz indicated that she would "research that option[.]" *Id.*

Approximately two weeks later, on July 26, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz, during which he reported that "it takes everything to go through the day" due to pain in his "brain[,] [] eyes, [and] organ[s.]" (AR 2018) (internal quotation marks omitted). Plaintiff reported that he "[t]akes [c]annabis oils 3-4 times per day" and "wants to inquire about assisted suicide in Vermont[.]" *Id.* (internal quotation marks omitted). Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented[,]" although he was "[c]rying during [the] session" and "[f]rustrated with not feeling well for so long[.]" *Id.* In her assessment, Nurse Neacsu-Katz wrote "[c]omplex body pains[,]" "[o]ccipital migraines[,]" and "[l]ong [COVID] symptoms[.]" *Id.*

Within a week, Plaintiff followed up with Nurse Neacsu-Katz via video on August 2, 2023, reporting "[h]aving a lot of bad days" but "feeling slightly better" each day. (AR 2017.) Plaintiff stated that his "[s]tomach is upset all the time" and he "takes cannabis oil" to manage his pain. *Id.* Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented" but "appears depressed[.]" *Id.* She assessed Plaintiff as having "[p]ost [COVID] symptoms" and "[d]epression[.]" *Id.* A week later, Plaintiff had another video consultation with Nurse Neacsu-Katz, stating he was "[f]eeling 'much better'" and "not in pain today[.]" (AR 2016) (internal quotation marks omitted). Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented" and "stable[.]" *Id.*

The same month, on August 17, 2023, Plaintiff followed up with Nurse Neacsu-Katz for a video consultation, reporting that he had a "5-6 hour[]" episode yesterday where he "ha[d] to l[ie] flat[.]" (AR 2015) (internal quotation marks omitted). Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented" but had "[d]epression" and "[p]ain post [COVID.]" *Id.* A week later, on August 24, 2023, Plaintiff saw Nurse Neacsu-Katz via video. Plaintiff advised that he was "struggling with pain from a recent fall" and

continuing "to have sensitivity to light[.]" (AR 2014.) Nurse Neacsu-Katz noted that
Plaintiff's "[h]eart rate during [the] consultation [was] 107[.]" *Id.*[7] Nurse Neacsu-Katz
found Plaintiff was "[a]lert and oriented" despite being "[u]nable to look into the camera
[because his] '[e]yes hurt'" and assessed Plaintiff with "[p]alpitations[,]" "[p]ain[,]" and
"[s]ensitivity to light[.]" *Id.*

At the end of the month, on August 31, 2023, Plaintiff had a follow-up video visit
with Nurse Neacsu-Katz. During the consultation, Plaintiff reported that he "has been
struggling with long [COVID] for 2 years" and was "[l]ooking into finding a hospital that
'works with long[ COVID] patients[.]'" (AR 2013.) Plaintiff stated that he was "suicidal"
and "planning to go to the E[D] for evaluation 'to get [him]self admitted[.]'" *Id.* (internal
quotation marks omitted). Nurse Neacsu-Katz noted that Plaintiff was "[ly]ing on the
floor" and "[s]obbing uncontrollably" during the consultation. *Id.* She found that Plaintiff
was "[m]entally unstable" and his long COVID symptoms were "unmanageable" and
wrote that he would be taken to the hospital. *Id.*

The next day, on September 1, 2023, Plaintiff visited the ED at NYU Langone
Hospital, and the doctor noted that "[Plaintiff] is [a] 59-year-old gentleman with a past
medical history of chronic pain, multiple unexplained somatic complaints[,] and a
previous COVID infection who came in due to back pain requesting physician assisted
suicide." (AR 1688.) The ED held Plaintiff for suicide ideation and on September 5,
2023, transferred him to Catholic Mercy Hospital for inpatient psychiatry, where he
remained until September 18, 2023.

After his discharge, on September 27, 2023, Plaintiff followed up with Nurse
Neacsu-Katz via video, reporting that he was "[l]osing the ability to manage [his] body"
and "becom[ing] non-functional" when he stands up. (AR 2011) (internal quotation
marks omitted). Nurse Neacsu-Katz took Plaintiff's respiratory rate, pulse, and blood
pressure and found that Plaintiff was "[a]lert and oriented" and "[s]miling over [the]

---

[7] It is unclear how this was measured via video.

camera[.]" *Id.* In her assessment, Nurse Neacsu-Katz wrote "[f]luctuating heart rate[,]" "[m]ood improved[,]" and "[d]ifficulty functioning in [a] standing position[.]" *Id.*

The following month, on October 5, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz. Plaintiff reported that he "discontinued [] beta blockers" because they made him sick, that "[y]esterday, he had an episode of pain that lasted 5 hours[,]" and that he was "[s]ee[ing] [an] electrophysiologist[.]" (AR 2027.) Plaintiff requested that Nurse Neacsu-Katz refer him to Dartmouth-Hitchcock's long COVID clinic. Nurse Neacsu-Katz took Plaintiff's pulse, respiratory rate, and blood pressure[8] and noted that Plaintiff was "[a]lert and oriented" but "wear[ing an] eye shield" and "[ly]ing on the floor during [the] consultation[.]" *Id.* Nurse Neacsu-Katz found that Plaintiff's "[l]ong [COVID] symptoms persist" and sent a referral for Plaintiff to Dartmouth-Hitchcock's long COVID clinic. *Id.*

Shortly thereafter, on October 11, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz, reporting that he "lost a [second dental] implant yesterday" but was "[f]eeling good right now[.]" (AR 2026) (internal quotation marks omitted). Nurse Neacsu-Katz noted Plaintiff was "[a]lert and oriented" and "[s]itting upright during [the] consultation" even though he "usually is in supine or prone position[.]" *Id.* Nurse Neacsu-Katz found that there was "[s]light improvement in [Plaintiff's] post [COVID] symptoms[.]" *Id.*

A week later, on October 18, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz, reporting that he "[h]as finished 3 days of [a]moxicillin[,]" that his "[s]ymptoms [are] improving[,]" and that his "[p]alpitations and blood pressure [are] in check[.]" (AR 2025) (internal quotation marks omitted). Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented" despite "[ly]ing on the floor during [the] consultation[.]" *Id.* In her assessment, Nurse Neacsu-Katz wrote that Plaintiff "is stable[.]" *Id.*

---

[8] It is likewise unclear how these were measured via video.

Approximately one week later, on October 26, 2023, Plaintiff followed up with Nurse Neacsu-Katz via video, reporting the following: "I am up and down; I think I am getting [b]etter[.]" (AR 2024) (internal quotation marks omitted). Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented" and "[s]itting upright[.]" *Id.* In her assessment, Nurse Neacsu-Katz found Plaintiff's "[p]ost [COVID] symptoms fluctuating[.]" *Id.*

A few days later, on October 31, 2023, Dr. Parsonnet denied Nurse Neacsu-Katz's referral for Plaintiff's admission to Dartmouth-Hitchcock's long COVID clinic, explaining: "This if the fifth time that [Plaintiff] has been referred to the [long COVID] [c]linic. He does not meet criteria for being seen by us. I would be happy to discuss the case on the phone with his primary care provider." (AR 2067.) The next day, on November 1, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz, reporting that his "[b]rain fog improved" and that he "feel[s] good" for "[a]n hour here and there" but gets "fatigued very easily[.]" (AR 2023) (internal quotation marks omitted). Plaintiff relayed that he "[s]aw [an] electrophysiologist yesterday who diagnosed him [with] [d]ysautonomia[.]"[9] *Id.* Nurse Neacsu-Katz found Plaintiff was "[a]lert and oriented" and "[s]itting upright[.]" *Id.* In her assessment, Nurse Neacsu-Katz wrote "[d]ysautonomia[,]" "[s]ymptoms improving[,]" and "[gastrointestinal] issues persist[][.]" *Id.*

Approximately one week later, on November 9, 2023, Plaintiff had a follow-up video visit with Nurse Neacsu-Katz and reported: "It's been a bad week; symptoms came back; I have been spending my time l[]ying flat on the floor; started feeling sick on Friday; I had pain in my abdomen, nothing I have experienced before; full body pain came back yesterday[.]" (AR 2022) (internal quotation marks omitted). Plaintiff stated that he might not "be able to have Thanksgiving with his family [because] 'I cannot travel in the car or sit upright[.]'" *Id.* Nurse Neacsu-Katz noted that Plaintiff was "pale" but "sitting upright during [the] consultation[.]" *Id.* Nurse Neacsu-Katz found, in her assessment, that Plaintiff had "[p]ost [COVID] symptoms exacerbation[.]" *Id.*

---

[9] There is no medical record pertaining to this visit in the administrative record. "Dysautonomia" is defined as "[a]bnormal functioning of the autonomic nervous system." Stedman's Medical Dictionary 271800.

A week thereafter, on November 16, 2023, Plaintiff had a video consultation with Nurse Neacsu-Katz and relayed: "I am having better days; brain fog is really lifting; heart rate is going down. My digestion is painful when I move. [My e]nergy has been somewhat better this last week." (AR 2021) (internal quotation marks omitted). Nurse Neacsu-Katz recorded that Plaintiff was "[a]lert and oriented[,]" "[s]itting upright[,]" and "smiling[.]" *Id.* Nurse Neacsu-Katz concluded that Plaintiff's "[s]ymptoms [were] improved[.]" *Id.*

On November 27, 2023, Plaintiff followed up with Nurse Neacsu-Katz via video, advising that he was "feeling better and better" and "feeling much better since he switched to a vegan diet one week ago" which helped with digestion and bloating. (AR 2020) (internal quotation marks omitted). Nurse Neacsu-Katz assessed Plaintiff with "[l]eaky gut[,]" "[l]ow digestive enzymes[,]" "H[. p]ylori in stool[,]" and "[b]acterial overgrowth[.]" *Id.* As a result, Nurse Neacsu-Katz prescribed Plaintiff with the following medications aimed at promoting gut health: Ortho Biotic, Biocidin, and Digestzymes.

The following month, on December 14, 2023, Plaintiff saw Nurse Neacsu-Katz for a follow-up video consultation wherein Plaintiff reported that his "stomach is healing[,]" that he "[w]alks 3 miles per day[,]" and that he "[s]aw [a] cardiologist yesterday [and] 'things are in check[.]'" (AR 2010) (internal quotation marks omitted). Nurse Neacsu-Katz observed that Plaintiff was "[a]lert and oriented" and "[s]itting upright[.]" *Id.* In her assessment, Nurse Neacsu-Katz noted that Plaintiff's "[s]ymptoms [are] improving[.]" *Id.*

That same month, on December 29, 2023, Nurse Neacsu-Katz completed a medical source statement for Plaintiff related to his Social Security Disability benefits wherein she stated that Plaintiff had medical conditions of post COVID condition and dysautonomia and symptoms of "gut [issues], dizziness, difficulty standing, [and] mental confusion[.]" (AR 1960.) Nurse Neacsu-Katz opined that Plaintiff could not lift more than twenty pounds and could only sit for twenty minutes at a time, stand for ten minutes at a time, and walk for thirty minutes at a time. She found that Plaintiff would "have episodes which would incapacitate him . . . from work[]" "more than 20% of the time[.]" (AR 1963.)

## II.    Conclusions of Law.

### A.    Standard of Review.

The parties agree the STD and LTD are governed by ERISA. They each move for "judgment on the administrative record," which is "a motion that does not appear to be authorized in the Federal Rules of Civil Procedure." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). Instead, "[s]ince there is no right to a jury trial under ERISA," a court's "'*de novo* review of the parties' submissions' and resolution thereof[] can best be understood as essentially a bench trial 'on the papers' with the [d]istrict [c]ourt acting as the finder of fact." *Id.*; *see also Baumer v. Ingram Long Term Disability Plan*, 803 F. Supp. 2d 263, 267 (W.D.N.Y. 2011) ("Because there is no right to a jury trial under ERISA, the district court typically acts as the finder of fact and conducts a bench trial 'on the papers.'") (citation omitted).

Lincoln requests that the court conduct a bench trial on the papers, and Plaintiff requests that the court make certain credibility assessments and concedes that "[i]f the [c]ourt determines that *de novo* review applies, the proper procedure is a bench trial based on the administrative record." (Doc. 36 at 5) (citation omitted); *see also Parisi v. UnumProvident Corp.*, 2007 WL 4554198, at *2 (D. Conn. Dec. 21, 2007) (treating motions for judgment on the administrative record as a bench trial on the papers because plaintiff "expressly contends that, pursuant to *Muller*, the court should conduct a bench trial on the papers[]" and defendant "asks the court to make findings of fact, which . . . indicates [defendant]'s support for a bench trial on the papers here[]").

In a bench trial on the papers, "the district court must 'find the facts specially and state separately its conclusions of law thereon,' as well as 'judge the credibility of witnesses[.]'" *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001) (citing Fed. R. Civ. P. 52(a)). Because the Plans are governed by ERISA, Plaintiff has the burden to establish that he is entitled to benefits. *See Pruter v. Loc. 210's Pension Tr. Fund*, 858 F.3d 753, 762 (2d Cir. 2017) ("[A] plaintiff bears the burden of demonstrating entitlement to ERISA benefits.") (citation omitted).

### B.    Whether *De Novo* or Arbitrary and Capricious Review Applies.

"Although it is a 'comprehensive and reticulated statute,' ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09, (1989) (internal citation omitted). The Supreme Court has held that the denial of benefits under ERISA "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. "[W]here the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [courts] will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (citations omitted).

Under a *de novo* review standard, "a district court reviews all aspects of an administrator's eligibility determination, including fact issues, *de novo*." *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 293 (2d Cir. 2004) (citations omitted). "The court affords no deference to the insurer's interpretation of the plan documents, its analysis of the record, or its conclusions regarding the merits of the claim." *Jarosz v. Am. Axle & Mfg., Inc.*, 372 F. Supp. 3d 163, 178 (W.D.N.Y. 2019), *amended,* 2019 WL 12239557 (W.D.N.Y. May 31, 2019). In other words, "[t]he [c]ourt stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that []he is entitled to benefits under the plan." *Rappaport v. Guardian Life Ins. Co. of Am.*, 782 F. Supp. 3d 109, 118 (S.D.N.Y. 2025) (internal quotation marks and citations omitted). In doing so, the court must "review the [p]lan as a whole, giving terms their plain meanings[,]" and where there are ambiguities in the plan, "those ambiguities [must be] construed in favor of the plan beneficiary." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).

In contrast, "[i]n reviewing the administrator's decision deferentially, a district court must consider 'whether the decision was based on a consideration of the relevant

41

factors.'" *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation omitted). "Under the arbitrary and capricious standard of review, [courts] may overturn an administrator's decision to deny ERISA benefits 'only if it was without reason, unsupported by substantial evidence[,] or erroneous as a matter of law. This scope of review is narrow; thus, [courts] are not free to substitute [their] own judgment for that of the insurer as if [they] were considering the issue of eligibility anew.'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83-84 (2d Cir. 2009) (alterations adopted) (quoting *Pagan*, 52 F.3d at 442). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (internal quotation marks and citation omitted). "Nevertheless, 'where the administrator imposes a standard not required by the plan's provisions[] or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious.'" *Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund*, 559 F.3d 140, 147 (2d Cir. 2009) (citations omitted).

In applying an arbitrary and capricious standard of review, a court must interpret the ERISA plan "in an ordinary and popular sense as would a person of average intelligence and experience." *Id.* (internal quotation marks and citations omitted). "In determining whether, in an ERISA eligibility determination, the interpretation is arbitrary and capricious, the relevant factors were considered, or substantial evidence was relied upon, the [c]ourt is limited to the reasons given 'at the time of the denial.'" *Danouvong ex rel. Est. of Danouvong v. Life Ins. Co. of N. Am.*, 659 F. Supp. 2d 318, 324 (D. Conn. 2009) (citations omitted).

"[W]hen reviewing claim denials, whether under the arbitrary and capricious or *de novo* standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 60 (2d Cir. 2016) (citation omitted). In this

42

case, the court considers post-claim evidence for the limited purpose of credibility and reliability.

### 1. The STD.

It is undisputed that the STD does not contain a discretionary clause granting Verista authority to interpret the plan. The absence of any discretionary clause generally results in a court applying the default *de novo* standard of review. *See Firestone Tire & Rubber Co.*, 489 U.S. at 115. Verista, however, argues that the Administrative Services Agreement ("ASA") between itself and Lincoln regarding their roles under the STD "give[s] Verista authority to interpret the [STD][]" and, therefore, "Verista's decision denying [STD] benefits is subject to arbitrary and capricious review." (Doc. 42 at 7.)

### a. Whether the Court May Consider the ASA.

The ASA is not contained in the administrative record. "The decision whether to consider evidence from outside the administrative record is within the discretion of the district court." *Muller*, 341 F.3d at 125 (citing *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66 (2d Cir. 1997)). "Nonetheless, the presumption is that judicial review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence.'" *Id.* (quoting *DeFelice*, 112 F.3d at 67). As the Second Circuit has clarified,

> [this] doctrine limiting review of ERISA claims to evidence before the plan administrator was developed to prevent federal courts from becoming "substitute plan administrators" and thus to serve ERISA's purpose of providing "a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." However, this concern is not implicated in cases where the extraneous evidence being offered goes to a question that was not, or could not have been, under consideration by the plan administrator.

*Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 318 (2d Cir. 2008) (internal citations omitted).

In *Daniel*, a General Services Agreement between the defendants established that the plan did not confer discretionary authority on the plan administrator. The district court refused to consider the agreement, however, because it was not included in the

administrative record. On appeal, the Second Circuit found that the district court erred in so refusing, reasoning that "[t]he General Services Agreement was offered not to establish a historical fact pertaining to the merits of [the plaintiff]'s claim—for example, that [the plaintiff] suffered from any particular ailment or experienced any kind of pain— but rather to establish which entity actually decided her claim and therefore which standard of review was applicable in federal court." *Id.*

The same approach is warranted here. Although the ASA was not included in the administrative record in this case, similar to *Daniel*, Verista offers the ASA not to dispute the merits of Plaintiff's claim but to prove the STD contains a discretionary clause that affects "which standard of review" is applicable. *Id.*; *cf. Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 647 (2d Cir. 2002) (declining to consider additional evidence outside the administrative record because "[t]he additional information . . . appears to be aimed at bolstering [the proponent's] legal position and not at providing fuller review of [plaintiff]'s claim[]"). As a result, there is good cause for the court to consider the ASA to determine a question of law regarding the appropriate standard of review unrelated to the merits of Plaintiff's claim.

### b.    Whether the ASA Determines the Standard of Review.

"ERISA's framework . . . ensures that plans be governed by written documents filed under ERISA's reporting requirements and that [a summary plan document ('SPD')], drafted in understandable language, be the primary means of informing participants and beneficiaries." *Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988) (citations omitted). "Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans." *Id.* For that reason, "[t]he Second Circuit has determined that formal documents, such as the [p]lan documents themselves and their SPDs, 'govern an employer's obligations under ERISA plans.'" *Snyder v. Elliot W. Dann Co.*, 854 F. Supp. 264, 271 (S.D.N.Y. 1994) (quoting *Moore*, 856 F.2d at 492).

In determining whether a document is a "plan document," courts typically consider whether it creates rights or obligations for the beneficiary. *See, e.g., Long Island*

*Neurological Assocs., P.C. v. Highmark Blue Shield*, 375 F. Supp. 3d 203, 207 (E.D.N.Y. 2019) ("For ERISA-purposes, a plan document 'is one which a plan participant could read to determine his or her rights or obligations under the plan' and not one that merely 'memor[i]alizes' the obligations the administrator and [d]efendant [c]ompany owed to each other.") (alterations adopted) (citations omitted); *Minerley v. Aetna, Inc.*, 2018 WL 4693963, at *6 (D.N.J. Sept. 29, 2018) ("A document may serve as an ERISA plan document if, 'from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.'") (quoting *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 190 (3d Cir. 2014)), *aff'd*, 801 F. App'x 861 (3d Cir. 2020).

Verista argues that "the [STD's] summary plan description is not the full plan document; it is just one part of the larger [ASA] between Lincoln and Verista." (Doc. 43 at 5-6.) This argument is supported by the STD's designation as a "Plan Summary[,]" which readily suggests that it is a summary of a more comprehensive document. (AR 2964.) Verista, however, provides no evidence that the ASA was disseminated to STD plan participants. As Plaintiff points out, courts have refused to consider ASAs in determining whether a plan administrator has discretionary authority because ASAs are contracts between employers and administrators and generally not provided to plan participants.[10]

---

[10] *See, e.g., Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 813 F.3d 420, 429 (1st Cir. 2016) (finding the premium account agreement between employers could not resolve the ambiguity of whether the plan granted the plan administrator discretionary authority because "the terms appear in a financing arrangement between the employer and the claims administrator that was never seasonably disseminated to the beneficiaries against whom enforcement is sought[]"); *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 817 (7th Cir. 2002) (finding the ASA did not give the plan administrator discretionary authority because "it is not a 'plan document' for purposes of holding its terms against a plan participant or beneficiary[]"); *Miller v. PNC Fin. Servs. Grp., Inc.*, 278 F. Supp. 3d 1333, 1351 (S.D. Fla. 2017) ("The Eleventh Circuit has not yet addressed the exact issue here, which is whether delegation of authority to a third party through a contract, which is not referenced in the Plan document, can constitute a grant of discretion such that judicial review of the third party's ERISA determination is reviewed only for abuse of discretion. The [c]ourt agrees with the majority of courts to consider the issue, which have found that it cannot.") (footnote omitted) (collecting cases).

Although the Second Circuit has not addressed this issue, among district courts, "there appears to be a consensus that an ASA is not an ERISA plan document and, therefore, a [p]lan beneficiary is not bound by its terms." *Highmark Blue Shield*, 375 F. Supp. 3d at 208. District courts within the Second Circuit, however, have considered ASAs in deciding ERISA claims, generally in conjunction with other plan documents.[11]

In *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758 (2d Cir. 2002), the Second Circuit expressed concerns with finding plan participants bound by discretionary clauses set forth in ASAs:

> The language in the ASA reserving to [the employer] "discretionary authority to review all denied claims for benefits under the Plan," and providing that questions "as to the proper interpretation of the Plan with respect to eligibility for benefits or otherwise" should be referred to [the employer] for resolution, is sufficient under our cases to trigger the "arbitrary and capricious" standard of review.

> On the other hand, that delegation of discretionary authority is not described, or even mentioned, in the SPD. As we have previously noted, ERISA contemplates that the SPD is "an employee's primary source of

---

[11] *See, e.g., Gregory v. Metro. Life Ins. Co.*, 648 F. Supp. 591, 599 (D. Vt. 2009) ("American's [ASA] with MetLife expressly states that both MetLife and American have 'discretionary authority to determine eligibility for benefits, to construe the terms of the Plan, and to determine the validity of charges submitted for reimbursement under the Plan.' Thus, [d]efendants clearly reserved discretionary authority to decide [p]laintiff's benefits claims, and the arbitrary and capricious standard applies to this [c]ourt's review of such decisions.") (internal citations omitted); *Joyner v. Cont'l Cas. Co.*, 837 F. Supp. 2d 233, 238 (S.D.N.Y. 2011) (relying on the language of the plan and ASA to determine that "discretionary authority was vested in [predecessor company], and thus transferred to [successor company][]"); *Schnur v. CTC Commc'ns Corp. Grp. Disability Plan*, 2010 WL 1253481, at *10 (S.D.N.Y. Mar. 29, 2010) (considering the plan, a reinsurance agreement, and an ASA in determining whether plan administrator had discretionary authority), *aff'd*, 413 F. App'x 377 (2d Cir. 2011); *Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 102 (W.D.N.Y. 2000) (applying "the arbitrary and capricious standard of review[]" to plaintiff's ERISA claim in part because an ASA granted plan administrator discretionary authority); *but see Willard v. HSBC Bank USA Long Term Disability Plan*, 2006 WL 8455766, at *3-4 (W.D.N.Y. Mar. 30, 2006) (finding "defendant's argument that the Servicing Agreement (to which [employer] was not a party and which was not otherwise incorporated into the plan) constitutes a plan document authorizing re-delegation of discretion [was] not persuasive[]" because "the record does not reflect that [employer] authorized [plan administrator] to re-delegate the discretionary authority to [a third party][]" and "[w]hen a decision is made by a body other than the one authorized by the procedures set forth in the benefits plan, the standard of review is *de novo*[]").

information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." Among the types of information required to be included in the SPD are all "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." This requirement is reiterated in the regulations issued under § 1022, which explain that the SPD must "clearly identify circumstances which may result in . . . denial . . . of any benefits that a participant . . . might otherwise reasonably expect the plan to provide."

It may be argued that the giving of discretion to the plan administrator to interpret the meaning of plan terms is one such circumstance. For example, the plan at issue here excludes from coverage those services that are not "medically necessary." And a plan participant might reasonably expect that the determination of whether a particular service is "medically necessary" would be made by the participant's physician. It might also be reasonable for a plan participant to believe that, if the determination is instead to be made by a plan administrator (who has no medical training and whose employer has a financial incentive to deny coverage), the participant could appeal to a court and stand before that court on equal footing with the plan administrator. In other words, it could be contended that the participant might reasonably expect that the court would consider the question of "medical necessity" on its merits and decide *de novo* whether the administrator's determination was correct. And if, contrary to that expectation, the plan administrator has the discretion to make the determination, and the court is obligated to defer to that determination so long as it is not "arbitrary and capricious," it could be argued that a "circumstance" exists "which may result in . . . denial . . . of . . . benefits that a participant . . . might otherwise reasonably expect the plan to provide." If so, then the SPD should clearly identify the extent of the discretion, if any, granted to the plan administrator.

On the other hand, one might as forcefully maintain that the standard of judicial review is not such a circumstance because it simply fixes the procedure to be followed after a denial has occurred, and therefore a plan participant cannot be prejudiced by a lack of knowledge about that procedure. On this reading of the regulations, no mention of the standard of review would be needed in the SPD, so long as the standard is established in other plan documents, here the ASA.

*Id.* at 764-65 (alteration adopted) (internal citations omitted).

In *Mario*, the Second Circuit determined that it "need not resolve [the issue] now because, in the instant case, the plan administrator's determination survives even the broader *de novo* review." *Id.* at 765. The court adopts a similar approach here. Because

Plaintiff's claim does not survive the "even the broader *de novo* review[,]" *id.*, the court need not determine whether Plaintiff is bound by the discretionary clause in the ASA.

### 2.    The LTD.

The LTD gives Lincoln "the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder[]" and states that such determination "shall be conclusive and binding." (AR 2929.) Plaintiff concedes that this is a discretionary clause, under which an arbitrary and capricious standard of review would typically apply. However, Plaintiff contends that Indiana law, which governs the LTD, prohibits discretionary clauses in ERISA plans. In so arguing, Plaintiff relies on the Indiana Department of Insurance's ("IDI") Bulletin 103, wherein the IDI expresses its view that certain discretionary clauses in ERISA plans "are inequitable and deceptive[] and tend to mislead consumers." Bulletin 103, 2001 WL 35670606 (Ind. Ins. May 8, 2001).

ICI created Bulletin 103 to provide guidance to Indiana insurance companies after *Firestone Tire & Rubber Co.*, 489 U.S. 101, and its progeny. In Bulletin 103, ICI clarifies that its guidance is not binding. *See* Bulletin 103, 2001 WL 35670606 ("[ICI] takes no position on these cases or on the interpretation of employee benefit contracts governed by ERISA."). Indeed, Indiana courts have recognized discretionary clauses in ERISA plans and have applied an arbitrary and capricious standard of review. *See, e.g., Aschermann v. Aetna Life Ins. Co.*, 2010 WL 4778724, at *3 (S.D. Ind. Nov. 12, 2010) (holding that "[t]he arbitrary and capricious standard of review will apply to [p]laintiff's claims against [insurer][]" because the plan documents "delegated discretionary authority to decide eligibility for benefits to [insurer][]"), *aff'd,* 689 F.3d 726 (7th Cir. 2012).

Although Lincoln operated under a structural conflict of interest in deciding Plaintiff's LTD claim because it evaluated claims and paid benefits under the LTD, this conflict does not negate an arbitrary and capricious standard of review. "[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion[] but does not make *de novo* review

48

appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)); *see also Hobson*, 574 F.3d at 83 ("A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of 'several different considerations' that judges must take into account when 'review[ing] the lawfulness of benefit denials.'") (quoting *McCauley*, 551 F.3d at 133) (alteration in original).

Because the LTD contains a discretionary clause, the court will apply an arbitrary and capricious standard of review and will consider Lincoln's conflict of interest in evaluating Lincoln's denial of LTD benefits.

### C.    Whether the Court Can Consider New Grounds for Denial.

Plaintiff argues that Verista cannot raise new justifications for denying STD benefits that were "not included in any of Lincoln's notices of adverse determination[]" because "a plan administrator may not raise new grounds for denial during litigation that were not raised in the administrative decisions." (Doc. 36 at 4.) In particular, Plaintiff challenges any determination that his claim, for which he gave notice approximately 420 days after his alleged disability, was untimely. In denying ERISA benefits, a plan administrator must give "[t]he specific reason or reasons for the adverse determination[]" and "[r]eference [] the specific plan provisions on which the determination is based[.]" 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii).

As the Second Circuit has instructed, a plan administrator generally cannot "assert [a] newly coined rationale in litigation" that was not included in the decision to deny benefits. *Novella v. Westchester Cnty.*, 661 F.3d 128, 143 (2d Cir. 2011); *see also Meidl v. Aetna, Inc.*, 346 F. Supp. 3d 223, 244 (D. Conn. 2018) ("[C]ourts have routinely declined to consider justifications for a denial of benefits that have no basis in the administrative record and that are raised for the first time during litigation.") (collecting cases). However, this rule typically applies to ERISA benefit denials subject to an arbitrary and capricious standard of review, not to a *de novo* review. *See, e.g., Karanda v. Connecticut Gen. Life Ins. Co.*, 158 F. Supp. 2d 192, 198 n.4 (D. Conn. 2000) ("[The court] must determine whether [plan administrator]'s denial was arbitrary and capricious

49

based on the reasons [plan administrator] gave at the time for the denial."); *Wallace v. Grp. Long Term Disability Plan For Emps. of TDAmertrade Holding Corp.*, 2015 WL 4750763, at *2 (S.D.N.Y. Aug. 11, 2015) ("[W]hen reviewing an administrator's decision under the arbitrary and capricious standard, an ERISA plan administrator may not rely on a reason for denial of benefits that it did not give during the administrative proceedings.") (citations omitted).

In *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279 (2d Cir. 2000), the plaintiffs argued that "*de novo* review means that the court addresses for itself the bases for the denial of benefits that the plan administrator communicated to the member and then decides whether it would have reached the same conclusions on those bases as did the administrator." *Id.* at 287. The Second Circuit rejected this approach, finding that the plan administrator's "failure to mention medical necessity, the grounds on which the district court affirmed [the plan administrator]'s refusal to reimburse the [plaintiffs], in its communications to the [plaintiffs]," did not "constitute[] a waiver or estoppel with respect to its use of lack of 'medical necessity' as a defense in th[e] lawsuit." *Id.* As a result, the Second Circuit affirmed the district court's decision to consider a justification for denial which was not included in the plan administrator's decision.

In accordance with the foregoing principles, when reviewing the denial of STD benefits under a *de novo* standard of review, the court will consider Verista's reasons for denying Plaintiff benefits, even if those justifications were not provided in its denial decision and are instead raised for the first time in this litigation. When reviewing the denial of LTD benefits under an arbitrary and capricious standard of review, the court will only consider Lincoln's reasons for denying Plaintiff benefits as set forth in its denial decision.

    **D.**    **Whether Plaintiff Was Wrongfully Denied Benefits.**

        **1.**    **Plaintiff's Credibility.**

"It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.'" *Connors*, 272 F.3d at 136 (citation omitted). However, "a district court reviewing an administrator's decision *de*

*novo* is not required to accept such complaints as credible[.]" *Id.* (citations omitted); *see also Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 101-02 (2d Cir. 2003) ("[W]hile a district [court] is not required to accept a plaintiff's subjective complaints as credible, 'it cannot dismiss complaints of pain as legally insufficient evidence of disability.'") (citation omitted).

Although the STD and LTD generally require "[n]otice of claim [to] be given . . . within 30 days of the date of the loss on which the claim is based[,]" (AR 2977, 2930), Plaintiff did not give Lincoln and Verista notice of his claims until April 11, 2023, well over a year after the date of his alleged disability. Plaintiff proffers no reason for his delay.

While working at Verista, Plaintiff did not miss work or use any sick leave. There is no evidence in the administrative record indicating that Plaintiff's work was inadequate or that he requested accommodations. The only reason for Plaintiff's termination was that Verista's engagement with a client had ended. However, well after the fact, Plaintiff advised Dr. Root, in conjunction with his Social Security Disability benefits claim, that he left Verista in February 2022 because "he was not able to go to meetings and do job-related tasks." (AR 653.) He also, however, "denie[d] ever having any work adjustment problems." *Id.* Plaintiff never told anyone at Verista that he was ill, although, in his notice of claim, Plaintiff asserted he "came down with [l]ong[ COVID] while working at Verista." (AR 2869.)

Plaintiff made inconsistent reports regarding when he was allegedly infected with COVID, although there is no objective evidence that he ever had a COVID infection.[12] For example, Plaintiff reported to various healthcare providers that he had a COVID infection in December 2021; he told an ophthalmologist that he had a COVID infection in January 2022 based on his June 21, 2022 report that he had "101 days" of light sensitivity

---

[12] Although, on September 15, 2022, Nurse Moulton conducted a SARS-CoV-2 Spike AB COVID test on Plaintiff, which detected antibodies, Nurse Moulton clarified that "[t]his test will detect antibodies made against the spike protein due to vaccination or from a previous infection." (AR 2454.) Plaintiff previously received a COVID vaccine on May 10, 2021, and thus, as Nurse Moulton noted, the test "[r]esults cannot be used to diagnose acute [COVID] . . . infection." *Id.*

51

which was brought on by a COVID infection "7 weeks prior to th[e] light sensitivity"; he told an ED doctor at BFMC that he had a COVID infection in February 2022; he told an ED doctor at SVMC that his COVID "started when he had a kidney stone" on or about April 14, 2022; and he indicated to Nurse Neacsu-Katz that his COVID began in approximately August 2021 pursuant to his August 31, 2023 report that he had "been struggling with long [COVID] for 2 years[.]" (AR 1109, 2013, 2281.) Plaintiff admits that his "memory is not good[.]" (AR 2765.)

Because Plaintiff's reports regarding his alleged COVID infection most consistently claim an infection date in December of 2021, his medical records from that period warrant additional scrutiny. In December 2021, Plaintiff neither sought treatment from a healthcare provider nor is there a test result verifying a COVID infection from that month. When he was treated by Dr. Park on February 15, 2022, Plaintiff did not report a COVID infection or COVID-like symptoms other than fatigue. Instead, on February 15, 2022, Plaintiff told Dr. Park that he "overall feels well." (AR 2662.)

Plaintiff reported to doctors that he "had hundreds of seizures" when there is no medical evidence indicating that he ever had a seizure. (AR 2281.) On November 9, 2023, Plaintiff told Nurse Neacsu-Katz he could not "sit upright[,]" but Nurse Neacsu-Katz noted that Plaintiff was "sitting upright during [the] consultation[.]" (AR 2022) (internal quotation marks omitted). Plaintiff advised Lincoln that he had been hospitalized for long COVID even though he had not been, although it is conceivable that by this he meant his visits to the ED or his psychiatric hospitalization in January 2023.

Plaintiff's alleged long COVID is based on his self-reports and is unsupported by clinical findings. Several of Plaintiff's healthcare providers attributed his brain fog and other symptoms to his cannabis use or psychiatric disorders rather than long COVID. For example, on February 15, 2022, Dr. Park found Plaintiff's fatigue to be associated with his "change of cannabis use"; on January 31, 2023, the ED doctor at BFMC found "that [Plaintiff's] chronic use of cannabis oil [might have] contributed to previous psychotic symptoms"; and on March 2, 2023, the ED doctor at DHMC found Plaintiff's brain fog,

fatigue, and photophobia symptoms "are most suspicious for sequelae of his complex psychiatric history." (AR 1969, 2163, 2663.)

Plaintiff concedes that for many years, he has been ingesting marijuana daily, and his wife/ex-wife described him as "a daily heavy-duty cannabis user." (AR 2455.) Dr. Gantz explained the impact of Plaintiff's substance abuse as follows:

- Of greatest concern, throughout the records, it is noted that [Plaintiff] "self-medicated" on a daily basis with THC oils or THC edibles. The dosages reported ranged anywhere from 50 m[illi]g[rams] to 600 m[illi]g[rams] of THC oil daily (01/31/2023; 11/03/2022[]; 02/15/2022). Furthermore, [Plaintiff] also claimed to mix his own drug cocktails to simulate THC (09/01/2023). Yet, there was no referral for substance abuse evaluation or treatment and only emergency psychiatric care documented.

- As noted . . . , these are very high concentrations of THC and can result in significant memory impairment, loss of coordination, and substantial physical reactions including nausea, lethargy, and heart palpitations. All of these were complaints that [Plaintiff] presented at various [EDs] and to at least 71 medical and mental health consultants.

(AR 126-27.) Even though Plaintiff told Dr. Root that he had been self-medicating with marijuana "since April 2022[,]" (AR 653), there is evidence he was using marijuana daily as of May 9, 2021. Most notably, both the SSA and Nurse Neacsu-Katz appear to be unaware of the magnitude and duration of Plaintiff's substance abuse. Accordingly, he either did not tell them, minimized his use, or they did not ask.

Although the court finds no evidence that Plaintiff was intentionally deceitful, it finds he is not a reliable source of information due to his conflicting statements, self-described poor memory, psychiatric symptoms, and extensive marijuana use.

## 2.   Nurse Neacsu-Katz's Reliability.

In reviewing an ERISA decision *de novo*, a court need not give deference to a treating physician's opinions. *See Connors*, 272 F.3d at 135 n.4 ("We do not adopt for these purposes—that is, when a district court reviews an ERISA administrator's decision under a *de novo* standard—the 'treating physician rule,' a standard developed in the Social Security context requiring 'that the fact-finder give greater deference to the expert

judgment of a physician who has observed the patient's medical condition over a prolonged period of time.'") (citation omitted). However, "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006).

The weight to be accorded to a treating physician's retrospective diagnosis depends on the circumstances. *See Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan*, 2012 WL 3309380, at *10 (D. Conn. Aug. 13, 2012) ("[A]n administrator should credit [a doctor]'s retrospective diagnosis only to the extent it is predicated on a medically accepted technique, and . . . the administrator should consider contradictory evidence in the record in evaluating the accuracy of the retrospective diagnosis[.]"), *aff'd,* 531 F. App'x 177 (2d Cir. 2013); *Green v. Hartford Life & Accident Ins. Co.*, 2010 WL 3907823, at *6 (N.D.N.Y. Sept. 30, 2010) ("[T]he court may consider and give appropriate weight to treating physicians' conclusions if they are reliable and probative."). The court should evaluate a treating physician's opinion "in the context of any factors it consider[s] relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Connors*, 272 F.3d at 135.

*Vonhagn v. Corning Inc.*, 590 F. Supp. 2d 418 (W.D.N.Y. 2008) is on point. There, the court found that the plan administrator's reviewing physician was justified in discrediting the plaintiff's treating physician's conclusions "that plaintiff was incapable of sitting, standing[,] or walking for more than one hour each in an eight-hour [workday]." *Id.* at 421. The *Vonhagn* court reasoned that the reviewing physician "expressly noted that he found plaintiff's complaints to be 'out of proportion' and 'not supported' by objective evidence in the record[]" and "sought to consult with [the treating physician] concerning his report of plaintiff's physical limitations, but [the treating physician] refused to do so." *Id.*

Nurse Neacsu-Katz did not begin treating Plaintiff until November 9, 2022, well after Plaintiff's symptoms allegedly began on December 25, 2021, and Plaintiff's reduced

ability to work allegedly began on January 1, 2022. She thus did not have a treatment relationship with Plaintiff during the time period for which she has provided opinions.

During the time period between her first meeting with Plaintiff on November 9, 2022, and diagnosing him with long COVID on April 24, 2023, Nurse Neacsu-Katz only had one in-person consultation with Plaintiff. The remainder of the time, she treated him by video and did not take his vital signs.

Although Nurse Neacsu-Katz ordered a COVID test, the result of such test is not contained in the administrative record, nor does she reference the test result. There is no indication that she verified Plaintiff had a COVID infection. In diagnosing Plaintiff with long COVID, she appears to have accepted, at face value, the veracity of Plaintiff's claims that his symptoms stemmed from long COVID. She did so even though she knew that Plaintiff was repeatedly denied participation in a long COVID clinic because there was no evidence that he had COVID.

Nurse Neacsu-Katz appears to have endorsed Plaintiff's reported diagnoses and symptoms in other contexts as well. For instance, Plaintiff reported a dysautonomia diagnosis and Nurse Neacsu-Katz adopted it as her own although there is no evidence that she reviewed any record from the electrophysiologist who allegedly diagnosed Plaintiff.[13] Nurse Neacsu-Katz apparently never addressed Plaintiff's chronic marijuana use and does not appear to have factored it into her treatment or diagnosis. This means she either did not review Plaintiff's medical records or she ignored them.

Nurse Neacsu-Katz's medical source statement, completed on December 29, 2023, for Plaintiff's Social Security Disability benefits, indicated that she believed Plaintiff was disabled, but she did not address Plaintiff's most recent visits with her in November and

---

[13] Most, if not all, of Nurse Neacsu-Katz's assessments of Plaintiff's conditions were based solely on Plaintiff's self-reported symptoms. Additional examples include the following: Plaintiff reported pain in his right elbow for a month and Nurse Neacsu-Katz assessed him as having tendonitis in his right elbow; Plaintiff reported pain in his brain, eyes, and organs and Nurse Neacsu-Katz assessed him as having complex body pains; and Plaintiff reported feeling non-functional when he stood up and Nurse Neacsu-Katz assessed him as having difficulty functioning in a standing position.

December 2023 wherein Plaintiff reported that he was "feeling better and better" and that his "stomach [was] healing," "brain fog [was] really lifting[,] heart rate [was] going down[,]" and energy was better. (AR 2010, 2020, 2021) (internal quotation marks omitted). Nurse Neacsu-Katz also did not address her findings that Plaintiff's symptoms were improved in both November and December 2023. In her statement to the SSA, Nurse Neacsu-Katz indicated Plaintiff could not stand for more than ten minutes "at one time" nor walk for more than thirty minutes "at one time" even though fourteen days prior, Plaintiff told her that he was walking "3 miles per day[.]" (AR 1961, 2010) (capitalization removed).

Because Nurse Neacsu-Katz's findings are not supported by the objective evidence in the administrative record, are inconsistent with Plaintiff's medical records, and appear to accept any diagnosis Plaintiff proffered, her retrospective diagnosis and opinions are unreliable and entitled to little weight. *See* Fed. R. Evid. 702; *see also Straehle v. INA Life Ins. Co. of N.Y.*, 392 F. Supp. 2d 448, 459 (E.D.N.Y. 2005) (discounting treating physician's conclusions because they were "inconsistent with the diagnoses of the many specialists [plaintiff] consulted, all of whom failed to uncover any condition that would explain the extent of her claimed pain and limitations[]" and "reached . . . solely on his 'acceptance of plaintiff's subjective complaints"); *Tritt*, 2012 WL 3309380, at *11 (according "little weight[]" to doctor's retrospective diagnosis because it "is not fully supported by the record[]" and was based on "plaintiff's recollections of her symptoms"); *cf. Galuszka v. Reliance Standard Life Ins. Co.*, 2017 WL 78889, at *24 (D. Vt. Jan. 9, 2017) ("Because [treating physician]'s opinions are based on a lengthy treatment period, are supported by objective medical findings, and are consistent with other evidence in the record, the court finds [treating physician]'s opinions credible and entitled to significant weight.").

### 3. Dr. Gantz's Reliability.

Plaintiff argues that Dr. Gantz's opinions lack credibility because "[i]nitially, Dr. Gantz opined that [Plaintiff] had been disabled since February 18, 2022[,]" and "[o]nly after Lincoln requested further clarification did Dr. Gantz revise his opinion, asserting

that [Plaintiff] did not become disabled until October 22, 2022[,]" which "raises serious concerns that Dr. Gantz's revised opinion may have been tailored to align with Lincoln's legal position, rather than grounded in an impartial review of the medical record." (Doc. 36 at 15.) However, Dr. Gantz did not initially find Plaintiff disabled as of February 18, 2022. Instead, he found Plaintiff had "[restrictions] and [limitations] of no more than activities of daily living[]" as of an unspecified date. (AR 124.) Because Dr. Gantz failed to provide a date upon which he believed Plaintiff's restrictions and limitations began, Lincoln asked him for clarification regarding an onset date. In response, Dr. Gantz opined that Plaintiff's restrictions and limitations from somatic symptom disorder began on or about October 22, 2022, and continued through December 29, 2023.

Plaintiff contests Dr. Gantz's October 22, 2022 disability "onset date" as unreliable because "[t]he only notable event on October 22, 2022, was [Plaintiff]'s visit to the [ED] at Delray Medical Center for dental pain." (Doc. 36 at 11, 15.) Lincoln counters that "Dr. Gantz did not 'select' an onset date, as Plaintiff asserts, but rather, he simply opined that the record evidence did not support any onset between February 18, 2022 and October 21, 2022." (Doc. 40 at 38) (alteration adopted) (internal citation omitted). The court agrees that Dr. Gantz did not select an onset date but, rather, picked a time frame during which Plaintiff was not disabled based on Plaintiff's medical records.

Dr. Gantz explained:

- Documentation did not support impairment from 02/[]18/2022 through 10/21/2022 because [Plaintiff] was documented as having traveled to Florida, was not engaged in high[-]frequency medical help seeking or [ED] visits, had normal Mental Status Examination findings during medical visits, and a normal score on the M[o]CA[.]

(AR 105.) This rationale accords with the evidence because in February of 2022, Plaintiff was still working full-time at Verista. Although Plaintiff did visit EDs once in April 2022 and twice in June 2022, for nearly three months thereafter, between June 24, 2022, and September 13, 2022, Plaintiff did not visit *any* healthcare provider, including Dr. Park, which supports Dr. Gantz's finding that Plaintiff "was not engaged in high[-]frequency

medical help seeking or [ED] visits" and thus not disabled prior to October 22, 2022. (AR 105.)

Plaintiff argues Dr. Gantz "claimed that [Plaintiff] had not visited an [ED] prior to October 22, 2022," (Doc. 36 at 15), when in fact Plaintiff went to the ED once in April 2022 for a kidney stone and twice in June 2022 for vision issues and photophobia. (AR 708.) Again, Dr. Gantz did not make this claim. His opinion regarding the time period prior to October 22, 2022, is grounded in the frequency of Plaintiff's ED visits. After Plaintiff's April 14, 2022, ED visit, he told Dr. Park he had "gotten better[.]" (AR 2656.) In Plaintiff's June 20, 2022 ED visit, the doctor found Plaintiff's "lab values" were "very reassuring" and his "inflammatory markers were negative[]" and "ruled out a number of worrisome conditions." (AR 697.) In Plaintiff's June 23, 2022 ED visit, the doctor concluded Plaintiff was not "suffering a medical emergency" and stated "[y]ou are safe to go home." (AR 1112-13.) As noted, Plaintiff's next ED visit, on October 22, 2022, was for dental pain. Dr. Gantz therefore correctly pointed out that, between February 18, 2022, and October 21, 2022, Plaintiff was not engaged in "*high[-]frequency . . .* [ED] visits" that supported a finding of disability. (AR 105) (emphasis supplied).

In contrast, between the approximate one-month period from October 22, 2022, to November 23, 2022, Plaintiff visited healthcare providers six times, visited the ED twice, and complained of a panoply of symptoms, including dental pain, fatigue, vision loss, light sensitivity, poor memory, gut pain, long COVID, chest pain, and joint pain. Dr. Gantz's selected onset date of October 22, 2022, reflects the fact that Plaintiff's somatic symptom disorder became persistent and severe at that time.

Dr. Gantz properly rejected Nurse Neacsu-Katz's opinions regarding Plaintiff's long COVID, finding "there was no clinical evidence to support anything beyond a mild case of self-reported [COVID] in December 202[1.]" (AR 103.) "ERISA [p]lan administrators need not give special deference to a claimant's treating physician." *Paese*, 449 F.3d at 442 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)); *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) ("[A] plan need not accord the insured's treating physician greater deference than a

plan's retained physician.") (citation omitted). As the Supreme Court has held, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician[.]" *Black & Decker Disability Plan*, 538 U.S. at 834; *see also Siegel v. Hartford Life Ins. Co.*, 2012 WL 2394879, at *13 (E.D.N.Y. June 25, 2012) ("When a plan administrator considers a claimant's subjective complaints of pain, but ultimately chooses not to credit them 'in light of the absence of any medical diagnosis or corroborating evidence,' such a determination is not arbitrary or capricious.").

In rejecting Nurse Neacsu-Katz's conclusions, Dr. Gantz grounded his opinions in Plaintiff's medical records and the objective evidence. He considered Plaintiff's self-reports, but cited his substance abuse and conflicting evidence as confounding factors. He did not rely on Nurse Neacsu-Katz's opinions who did not treat Plaintiff during the February 18, 2022, to October 22, 2022 time period.

Finally, even though Dr. Gantz was retained by and presumably compensated by Lincoln to review Plaintiff's claims, the Second Circuit has explained that a plan administrator "d[oes] not abuse its discretion by considering [] trained physicians' opinions solely because they were selected, and presumably compensated, by [the plan administrator]. Indeed, it is customary for plan administrators to do so in evaluating ERISA claims." *Hobson*, 574 F.3d at 90 (internal citation omitted).

For the foregoing reasons, the court finds that Dr. Gantz's opinions are reliable.

### 4.    Dr. Hooker's Credibility.

Plaintiff does not challenge the credibility of Dr. Hooker, who concluded that no physical restrictions and limitations can be reasonably supported from February 18, 2022, "to present or ongoing[]" because she found Plaintiff's primary impairing diagnoses were depression and anxiety. (AR 93.) These conclusions are supported by the record in light of the lack of objective testing, physical examinations, or clinical observations supporting Plaintiff's alleged physical limitations.

Dr. Hooker explained that Nurse Neacsu-Katz's March 27, 2024 letter did not alter her conclusions because the letter was based on "several non-specific subjective symptoms noted by [Plaintiff]; there [are] no supporting objective measures." (AR 100.)

59

The court has reached a similar conclusion. The March 27, 2024 letter was provided within a few months of Plaintiff's November and December 2023 visits with Nurse Neacsu-Katz wherein he reported "feeling better and better" and walking "3 miles per day" and that his "stomach [was] healing," "brain fog [was] really lifting[,] heart rate [was] going down[,]" and energy was better, and Nurse Neacsu-Katz found his "[s]ymptoms [are] improving[.]" (AR 2010, 2020, 2021) (internal quotation marks omitted). Even though Dr. Hooker was retained and compensated by Lincoln, that does not render her opinions unreliable. *See Hobson*, 574 F.3d at 90.

For the foregoing reasons, the court finds that Dr. Hooker's opinions are reliable and that, during the relevant time periods, Plaintiff had no physical limitations precluding him from full-time work.

### 5.    The SSA's Disability Benefits Determination.

Although Plaintiff received Social Security Disability benefits based on a disability onset date of February 26, 2022, "the SSA's determination d[oes] not bind either [an] ERISA [p]lan or [a] district court." *Paese*, 449 F.3d at 443.[14]

The SSA's reviewing physicians, Dr. Goldberg and Dr. Haak, found that "[t]here is no evidence of any substance abuse disorder/[drug addiction and alcoholism] issue[,]" (AR 179), which is flatly contradicted by multiple references in the record, including Plaintiff's self-reports that he used cannabis multiple times per day for years and needed it "to get [his] brain to work[,]" and Plaintiff's wife/ex-wife calling him "a daily heavy-

---

[14] *See also Flowers v. Hartford Life & Accident Ins. Co.*, 2023 WL 5628763, at *7 (S.D.N.Y. Aug. 31, 2023) (citation omitted) ("[C]laim administrators 'are not bound by an SSA's award of benefits.'"), *aff'd*, 2025 WL 33236 (2d Cir. Jan. 6, 2025); *Sevely v. Bank of New York Mellon Corp. Long Term Disability Coverage Plan*, 794 F. App'x 34, 37 (2d Cir. 2019) ("SSA awards may be considered when determining whether a claimant is disabled under a plan, but a plan administrator is not bound by such an award and is not required to accord deference to that determination because the plan's governing standards may be different.") (citation omitted); *Coley v. Hartford Life & Accident Ins. Co.*, 2025 WL 1786082, at *10 (D. Conn. June 27, 2025) ("Nor are plan administrators bound by the SSA's interpretation of a claimant's medical record, as the SSA's definition of the term disability is not necessarily coextensive with an ERISA plan's definition of that term.") (internal quotation marks and citation omitted), *appeal dismissed* (Sept. 22, 2025).

duty cannabis user." (AR 2358, 2455.) Dr. Park addressed Plaintiff's marijuana use on several occasions, and Dr. Barnyak advised Plaintiff that "[i]t may help with your photophobia and retching to reduce your marijuana use." (AR 1113.) Either Dr. Goldberg and Dr. Haak failed to review these medical records, or they failed to provide a reason for discounting them. Although Dr. Root recorded that Plaintiff "uses cannabis oils, which is not prescribed, to help in a self-medicating way for pain[]" and "uses cannabis several times a week for this reason[,]" he either ruled out or proposed ruling out cannabis use disorder in his assessment of Plaintiff. (AR 653.)

Plaintiff was working at Verista full-time eight days prior to the SSA's disability onset date without taking any sick leave or reporting sickness. Dr. Goldberg, Dr. Haak, and Dr. Root do not appear to have taken this into consideration.

For the foregoing reasons, the court accords the SSA's disability benefits determination little weight in determining whether Plaintiff is entitled to benefits under the Plans.

### 6. The STD.

#### a. Whether Plaintiff Was Disabled as of February 18, 2022.

To qualify for STD benefits, the "Disability must begin while the Employee is a participant of this Plan[,]" meaning before the employee's "date [of] employment terminates." (AR 2971, 2976.) Therefore, under the STD, Plaintiff's disability must have begun on or before February 18, 2022. Under the STD, an employee is disabled when he or she is "unable to perform" the "responsibilities that are normally required to perform [his or her] Own Job and cannot be reasonably eliminated or modified." (AR 2967-68.)

In denying Plaintiff benefits under the STD, Verista reasoned that the medical evidence did not "substantiate that [Plaintiff] met the definition of disability prior to his termination date[]" of February 18, 2022. (AR 54.) Plaintiff counters that he was disabled prior to February 18, 2022, because "[t]he first reference in the record to symptoms that caused the disability appear on February 15, 2022[,]" and "the preponderance of medical evidence indicates that, as of February 15, 2022, [Plaintiff] was no longer able to perform any highly complex, mentally demanding occupation due to fatigue and episodes of

complete dysfunction." (Doc. 36 at 8, 13.) The medical record of Plaintiff's February 15, 2022 visit, the circumstances of Plaintiff's employment and termination, and Plaintiff's own self-reports belie this claim.

Between the start of his employment with Verista, on August 30, 2021, and the end of his employment, on February 18, 2022, Plaintiff had three visits with Dr. Park. Two visits were a follow-up for Plaintiff's mood and medication regarding his ADD and depression and anxiety, and one visit was an annual examination.

Plaintiff has conceded that his February 15, 2022 visit with Dr. Park is the only evidence indicating his alleged inability to work as of February 18, 2022. During that visit, Plaintiff expressed that he "a little speck of blood" in his phlegm that morning. (AR 2659.) Plaintiff advised that his ADD was "fine" and that he had no "[n]eg[ative] systemic symptoms [and] overall feels well." (AR 2662.) Plaintiff complained of "no fever, no night sweats," "no cough, no wheezing, no shortness of breath," "no loss of consciousness, no weakness, no numbness, no seizures, no dizziness, and no headaches." *Id.* Dr. Park found that Plaintiff was "healthy[]appearing, well[]nourished, and well[]developed[,]" in "no acute distress[,]" and "ambulat[ing] without assistance." *Id.* According to Dr. Park, Plaintiff had "good judg[]ment[,]" "normal mood and affect[,]" and "normal" recent and remote memory, and Plaintiff was "active and alert[]" and "oriented to time, place, and person[.]" *Id.* To conclude the visit, Dr. Park told Plaintiff to "[h]ave a great time skiing" and "do not forget to wear a helmet[.]" (AR 2664.) There is also no evidence that Plaintiff expressed an inability to work, and Dr. Park imposed no work restrictions.

During the February 15, 2022 visit, although Plaintiff reported that he had been feeling "catatonic" and "sleepy[,]" Dr. Park attributed Plaintiff's complaint of fatigue to Plaintiff's "change of cannabis use" and "decreased THC" rather than an underlying illness. (AR 2662-63) (internal quotation marks omitted). Dr. Park noted that Plaintiff himself acknowledged his fatigue may be attributable to his decreased marijuana use and what Dr. Park referred to as "that awkward transition between reducing [his] combustible

marijuana and use of edible marijuana and some kind of dyssynergy with that[.]" (AR 2663-64.)

At the time, Plaintiff had not missed a single day of work. "Generally, an employee who continues to report to work cannot be found to have been simultaneously disabled under the terms of an ERISA plan which defines disability as including the inability to work." *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 674 (S.D.N.Y. 2011) (alterations adopted) (internal quotation marks and citations omitted).

Prior to the February 15, 2022 visit, Plaintiff had not visited the hospital since April 22, 2021. He had not complained of COVID or long COVID, nor had he tested positive or been diagnosed with either. Aside from fatigue attributed to his marijuana use, Plaintiff reported no other COVID-like symptoms. Instead, Plaintiff stated that he had no "systemic symptoms [and] overall feels well." (AR 2662.) Dr. Gantz's and Dr. Hooker's opinions that Plaintiff was not disabled prior to February 18, 2022, are substantiated by Plaintiff's medical records, and the court has deemed their opinions reliable. Against this backdrop, no rational decision-maker could find Plaintiff was disabled as of February 15, 2022.

For the foregoing reasons, the court finds that Plaintiff was not disabled under the STD as of his February 18, 2022 termination date because he was not "unable to perform" the "responsibilities that are normally required to perform [his] Own Job[.]" (AR 2967-68.)

### b.    Whether Plaintiff Was Disabled Throughout the Elimination Period.

Verista argues that it properly denied Plaintiff STD benefits because Plaintiff "did not have any absences prior to his termination that would have triggered the elimination period." (Doc. 43 at 5.) It asserts that it, "like most 'major employers[,]' offers sick time for short absences to keep an 'employee's salary steady during at least some part of the elimination period.'" (Doc. 42 at 10) (quoting Plitt et al., 12A Couch on Ins. § 182:10 (2025)). As Plaintiff points out, with respect to the elimination period, the STD does not require "that an employee miss work before termination." (Doc. 45 at 4.)

"[U]nambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning[.]" *Perreca v. Gluck*, 295 F.3d 215, 223 (2d Cir. 2002) (internal quotation marks and citations omitted). The STD's elimination period "begins on the first day of Disability[,]" from which seven "consecutive days of Disability" must pass "for which no benefit is payable." (AR 2965, 2967.) Courts have interpreted plan documents with similar elimination periods, mandating consecutive days of disability, as requiring continuous disability throughout the elimination period. *See, e.g.*, *Li v. First Unum Life Ins. Co.*, 2025 WL 326492, at *1 (S.D.N.Y. Jan. 29, 2025) ("The Policy provides for an elimination period of 180 days, which is a 'period of consecutive days of disability for which no benefit is payable,' and which begins on the first day of alleged disability. . . . The Policy thus required that [plaintiff] prove that he remained disabled through his elimination period."), *aff'd*, 2026 WL 112655 (2d Cir. Jan. 15, 2026).[15] The plain language of the STD thus requires Plaintiff to establish he was continuously disabled for seven consecutive days to satisfy the elimination period but does not require work absences to trigger its initiation.

When an ERISA plan has an elimination period requiring consecutive days of continuous disability, courts have noted that such bar "is a high one." *Tranbarger v. Lincoln Life & Annuity Co. of N.Y.*, 68 F.4th 311, 313 (6th Cir. 2023) "Even one day of partial work ability during the [e]limination [p]eriod is enough to defeat [a plan participant]'s claim." *Id.* (citation omitted).

Assuming *arguendo* that Plaintiff was disabled as of February 15, 2022, there is no medical evidence suggesting Plaintiff was disabled for seven consecutive days

---

[15] *See also Amoroso v. Sun Life Assurance Co. of Canada*, 2022 WL 2115117, at *1-2 (9th Cir. June 13, 2022) (finding that, because the elimination period required "ninety consecutive days of Disability to qualify for disability benefits[,]" plaintiff had a "burden of proving that he was disabled for ninety consecutive days[]"); *Amoroso v. Sun Life Assurance Co. of Canada*, 2021 WL 3930608, at *4 (W.D. Wash. Sept. 2, 2021) (denying plaintiff's ERISA claim because he "has not met his burden of proving that he was disabled for 90 consecutive days" as required by the elimination period), *aff'd*, 2022 WL 2115117 (9th Cir. June 13, 2022) *Toomey v. Unum Life Ins. Co. of Am.*, 324 F. Supp. 2d 220, 223, 228 (D. Me. 2004) (finding an elimination period defined as "a period of [180] consecutive days of disability for which no benefit is payable[]" required "180 days of continuous disability[]") (internal quotation marks omitted).

thereafter, as he continued to work until his termination three days later and did not visit a healthcare provider during that time period. In fact, Plaintiff did not visit a healthcare provider until over a month later on March 17, 2022.

For those reasons, the court finds that Plaintiff cannot establish he was disabled for seven consecutive days to satisfy the elimination period. Accordingly, Plaintiff has not met his burden of showing that he is entitled to STD benefits.[16]

### 7.    The LTD.

#### a.    The SSA's Disability Benefits Determination.

Plaintiff argues that Lincoln "failed to give a rational[] basis for not following [the SSA]'s disability determination." (Doc. 36 at 14.) However, in disagreeing with the SSA's determination, a plan administrator need not "explain why [it] reached a different conclusion." *Coley v. Hartford Life & Accident Ins. Co.*, 2025 WL 1786082, at *10 (D. Conn. June 27, 2025). As the Second Circuit has explained, "We encourage plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion . . . . Nonetheless, . . . we decline to hold that [the plan administrator]'s failure to do so in this case renders its denial of [the plaintiff]'s LTD benefits claim arbitrary and capricious." *Hobson*, 574 F.3d at 92.

Lincoln provided the following explanation for disagreeing with the SSA: "Lincoln did fully consider the [SSA]'s ruling to approve Social Security Disability [] benefits[]" and "has obtained and considered medical assessments that were not considered by the [SSA] in its determination process." (AR 34.) Under an arbitrary and capricious standard of review, this explanation was sufficient, and the record is replete with evidence supporting it.

#### b.    Whether Plaintiff Was Disabled As of February 28, 2022.

In denying Plaintiff benefits under the LTD, Lincoln reasoned that "[t]here remains insufficient medical evidence to substantiate that [Plaintiff] met the definition of

---

[16] Verista does not argue Plaintiff's STD claim was untimely in its motion for judgment on the administrative record, and the court likewise does not find it untimely.

disability prior to his February 18, 2022 termination date." (AR 34.) In order to qualify for benefits under the LTD, Plaintiff must have been disabled "on . . . the last day of the month of the coincident with . . . the date [his] employment terminate[d,]" (AR 2926), meaning Plaintiff must have been disabled as of February 28, 2022.

Plaintiff argues that he was disabled under the LTD due to his February 15, 2022 visit with Dr. Park. The court has rejected a finding of disability on this date under a more demanding, *de novo* standard. Plaintiff did not receive additional medical attention between February 15, 2022, and February 28, 2022.

### c.    Whether Plaintiff Was Disabled Throughout and Beyond the Elimination Period.

In denying Plaintiff LTD benefits, Lincoln concluded that Plaintiff's medical records "d[id] not contain significant physical or mental status exam findings, diagnostic test results, or other forms of medical documentation to verify that his impairments and symptoms were of such severity, frequency, and duration as to result in restrictions or limitations rendering him unable to perform the duties of his occupation throughout and beyond the [LTD]'s elimination period." (AR 34.) In order to qualify for benefits under the LTD, an individual must be continuously disabled for "consecutive days" during the elimination period, which is the first day of disability through at least 180 days in Plaintiff's case, and through, potentially, the subsequent 24 months.[17] (AR 2899.)

"Disability" requires that Plaintiff be unable to perform the material and substantial duties of his position at Verista and unable to perform the material and substantial duties of any occupation that Plaintiff "[was] or bec[a]me[] reasonably fitted [for] by training, education, experience, age, [and] physical and mental capacity." (AR 2897-98) (emphasis and internal quotation marks omitted). In his claim, Plaintiff

---

[17] The LTD's elimination period begins on the first day of disability and continues until "[t]he greater of: [(a)] the end of the Covered Person's [STD] Benefits; or [(b)] 180 days." (AR 2894.) Plaintiff did not receive STD benefits, and as a result, the elimination period would have been 180 days. An employee must be continuously disabled during the time they are seeking disability benefits, which can be provided for up to twenty-four months under the LTD. From the administrative record, the time period for which Plaintiff was seeking LTD benefits is unclear.

66

indicated that he sought LTD benefits based on long COVID, brain fog, cognitive decline, chronic fatigue syndrome, nerve pain, and vision loss.

With respect to long COVID, as various healthcare providers and Dartmouth-Hitchcock's long COVID clinic noted, there is no evidence, other than his self-reports, that Plaintiff had a COVID infection. It is reasonable "for ERISA plan administrators to accord weight to objective evidence . . . in order to guard against fraudulent or unsupported claims of disability." *Hobson*, 574 F.3d at 88. In this case, it was reasonable for Lincoln to deny Plaintiff LTD benefits based on the objective evidence, as well as Dr. Gantz's and Dr. Hooker's opinions and the Nurse Disability Consultant's review. It was also reasonable for Lincoln to reject Nurse Neacsu-Katz's findings because her "treatment notes contained very limited exam findings[]" and did not reveal any "significant physical exam abnormalities" nor "deficits in cognition, memory, or concentration[.]" (AR 34.)[18]

Plaintiff sought LTD benefits based on his alleged cognitive decline, but during the elimination period, on May 4, 2022, Plaintiff scored a 29 out of 30 on a MoCA, which indicated no cognitive impairment. On June 20, 2022, a neurologist found Plaintiff had a normal memory. Similarly, while Plaintiff complained of vision problems, on June 21, 2022, an ophthalmologist found that Plaintiff's eyesight and ocular conditions were normal. Throughout the 180-day elimination period, Plaintiff visited doctors and

---

[18] *See Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("[T]he administrator, far from ignoring the reports of the treating physicians, heavily relied on the fact that none of them adduced any objective evidence of plaintiff's complaints. In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator."), *aff'd,* 62 F. App'x 413 (2d Cir. 2003); *Tortora v. SBC Commc'ns, Inc.*, 739 F. Supp. 2d 427, 444 (S.D.N.Y. 2010) ("While an administrator may not arbitrarily disregard evidence submitted by a claimant's physician, [plan administrator] was not required to accept [plaintiff]'s subjective complaints in the absence of objective evidence supporting disability.") (footnotes omitted), *aff'd,* 446 F. App'x 335 (2d Cir. 2011); *Gaud-Figueroa v. Metro. Life Ins. Co.*, 771 F. Supp. 2d 207, 223 (D. Conn. 2011) ("[Plan administrator] acknowledged the reports from [plaintiff]'s treating physicians regarding her pain, but weighed this against the absence of objective medical findings that this pain rendered her totally disabled from all gainful employment as required by the Plan.") (citation omitted).

hospitals with divergent complaints including fatigue, chest pain, a tick bite, memory and vision issues, and brain fog. During this same period, however, none of Plaintiff's treating physicians indicated that these issues impacted his ability to work. Despite Plaintiff's numerous evaluations, examinations, and tests, his healthcare providers noted that his blood tests and imaging were normal and "look[ed] good" and that his labs were "reassuring" and "non[-]concerning[.]" (AR 395-96, 697.)

Against this backdrop, Plaintiff is unable to sustain his burden of establishing that he was continuously disabled during the elimination period.

### d. Lincoln's Structural Conflict of Interest.

Although a structural conflict of interest does not alter the arbitrary and capricious standard of review, a court must "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits[]" and "the significance of the factor will depend upon the circumstances of the particular case." *Glenn*, 554 U.S. at 108. The conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration[]" but "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy[.]" *Id.* at 117. "The presence of a conflict of interest should be dispositive only as a 'tiebreaker,' and is not relevant when the conflicted party's conduct cannot otherwise be characterized as arbitrary or capricious." *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 405 (S.D.N.Y. 2010) (citations omitted). "No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic*, 609 F.3d at 140 (citation omitted).

Because Lincoln operated under a structural conflict of interest by both reviewing claims and paying benefits under the LTD, the court must "determine how heavily to weigh[] the conflict of interest[.]" *Id.* at 138. Here, there is no evidence that Lincoln has a history of biased plan administration, and Plaintiff does not argue otherwise. Lincoln did not reject Plaintiff's claim on grounds that it was untimely, but instead made a

determination on the merits. To review Plaintiff's appeal, Lincoln hired two independent medical examiners, Dr. Gantz and Dr. Hooker, as well as a Nurse Disability Consultant. Plaintiff was afforded the opportunity to comment on the medical examiners' opinions.

Lincoln requested, received, and considered an abundance of medical records in order to conduct a thorough review of Plaintiff's claim. It afforded Plaintiff several opportunities to supplement the medical record. It followed up with Nurse Neacsu-Katz to obtain her opinions and, through Dr. Hooker, attempted to contact her to discuss them. Because Lincoln took steps to reduce potential bias and promote accuracy in rendering its decision on Plaintiff's LTD claim, because this is not a close call, and because Plaintiff has not shown that Lincoln's structural conflict of interest affected its decision, Lincoln's conflict is accorded no weight.

In light of the lack of evidence that Plaintiff was continuously disabled and unable to perform his position at Verista or any other relevant employment as of February 28, 2022, much less throughout the elimination period, it was not arbitrary and capricious for Lincoln to deny Plaintiff LTD benefits.[19]

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for judgment on the administrative record, (Doc. 36), GRANTS Lincoln's motion for judgment on the administrative record, (Doc. 39), and GRANTS Verista's motion for judgment on the administrative record. (Doc. 42.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _20th_ day of February, 2026.

Christina Reiss, Chief Judge
United States District Court

---

[19] Because the court determines it was not arbitrary and capricious for Lincoln to deny Plaintiff LTD benefits based on his lacking disability before his coverage ceased and throughout the elimination period, the court does not address Lincoln's alternative pre-existing condition ground for denial.